1

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF CONTRA COSTA

BEFORE THE HON. CHARLES S. TREAT, JUDGE PRESIDING

---oOo---

```
PEOPLE OF THE STATE OF CALIFORNIA, )
                                   )
                      PLAINTIFF,   )
                                   )
VERSUS                             )   Case No. 127484-4
                                   )
ABHINAV BHATNAGAR,                 )   1538.5 MOTION
                                   )
                      DEFENDANT.   )
_____)
```

COPY

REPORTER'S TRANSCRIPT OF PROCEEDINGS

November 27, 2006

Department No. 12

Walnut Creek, California

Appearances:

For the People:   ROBERT KOCHLY
                  DISTRICT ATTORNEY
                  By: Patrick Graber
                  Deputy District Attorney

For Defendant:    DAVID COLEMAN
                  PUBLIC DEFENDER
                  By: Diane Garrido
                  Deputy Public Defender

Reported By:      Juanita Gonzalez

                  CSR No. 3003

```
1  November 27, 2006                            Department No. 12
2
3            THE COURT:  People versus Abhinav Bhatnagar, 127484-4.
4            Ms. Garrido:  My two witnesses are present in the
5  courtroom.  I don't know if the People want to exclude.
6            Mr. Graber:  Ask they be excluded.
7            Ms. Garrido:  Wait in the hallway.  I will call you.
8            THE COURT:  Thank you for drawing my attention to that.
9            Is it stipulated the arrest was made without a warrant?
10           Mr. Graber:  It is.
11           THE COURT:  Proceed.
12           Mr. Graber:  Call officer -- May I ask, before we start
13  the evidence, what the scope of Miss Garrido's motion is?
14           Ms. Garrido:  Yes, Your Honor.  The motion focuses on
15  reasonable suspicion to detain Mr. Bhatnagar and does not focus
16  on any probable cause to arrest for a D.U.I. issue.  There are
17  other areas that I plan to explore regarding potential use of
18  racial profiling.
19           THE COURT:  All right.  Go ahead.
20           THE CLERK:  You do solemnly swear that the testimony
21  you shall give in the matter now pending before this Court,
22  shall be the truth, the whole truth, and nothing but the truth,
23  so help you God.
24           THE WITNESS:  I do.
25
```

```
 1                    OFFICER JASON INGRASSIA,
 2  called as a witness by the People, was duly sworn, and testified
 3  as follows:
 4           THE CLERK:  State your name and spell your name, for
 5  the record.
 6           THE WITNESS:  Jason Ingrassia, I-n-g-r-a-s-s-i-a, first
 7  name, J-a-s-o-n.
 8           THE COURT:  Before we begin, I had the impression from
 9  your brief that there was an issue about possible racial
10  prejudice or disparate treatment.  I wasn't clear on whether
11  there was profiling as such.  That means assuming that a person
12  of a particular ethnic background is more prone to commit a
13  certain offence or something like that.  Also not clear whether
14  this is properly brought under 1538.
15           Ms. Garrido:  Well, Your Honor, perhaps we can discuss
16  this in chambers briefly.
17           THE COURT:  Okay.
18
19             (In-chambers conference was held
20                without the court reporter.)
21
22             (The following proceedings
23                were held in open court:)
24
25           THE COURT:  Mr. Graber, you may proceed.
```

```
 1                    DIRECT EXAMINATION
 2  By Mr. Graber:
 3  Q.    Officer, how are you currently employed?
 4  A.    I am a deputy sheriff for the Contra Costa County
 5  Sheriff's Department.
 6  Q.    And who is your actual employer in that relationship?
 7        Let me rephrase.
 8        Who do you actually work for?
 9  A.    I work for the sheriff's office.  I am currently assigned
10  to the City of San Ramon as a contract city.
11  Q.    And were you on duty May 20th, 2006 at approximately
12  1:08 A.M.?
13  A.    Yes.
14  Q.    Have you previously investigated driving under the
15  influence cases?
16  A.    Yes.
17  Q.    About how many have you done?
18  A.    I have conducted several D.U.I. investigations.  I don't
19  even know how many investigations.
20  Q.    Have all those investigations led to arrests?
21  A.    No.
22  Q.    Where were you located on May 20th about 1:00 in the
23  morning?
24  A.    I was driving westbound on Bollinger Canyon Road.
25  Q.    Were you wearing a full police uniform?
```

1 A.     Yes.
2 Q.     Were you in a marked police vehicle?
3 A.     Yes.
4 Q.     And is that in Contra Costa County?
5 A.     Yes.
6 Q.     About that time did any vehicle attract your attention?
7 A.     Yes.
8 Q.     Why did the vehicle attract your attention?
9 A.     The vehicle, which was a silver, Nissan Sentra, attracted
10 my attention because it made an illegal U-turn at the
11 intersection which was in front of me.
12 Q.    Do you recall which intersection that was?
13 A.    It was Bollinger Canyon Road at Bishop Ranch One East.
14 Q.    Is there a posted sign indicating that U-turns are not
15 permitted at that intersection?
16 A.    Yes.
17 Q.    Is making a U-turn when there is a posted sign indicating
18 it's not permissible, a violation of the California Vehicle
19 Code?
20 A.    Yes.
21 Q.    Do you recall what section?
22 A.    It's Vehicle Code 22107.  I would have to look to make
23 sure.
24 Q.    What did you do when you observed the vehicle make the
25 illegal U-turn?

1  A.  I made the same U-turn and got behind the vehicle.
2  Q.  Which lane did the vehicle turn into when it made its
3  U-turn?
4  A.  It turned into -- Well, initially, I don't know which lane
5  it turned into -- so I don't know.
6  Q.  Which lane was the vehicle in when you observed it after
7  making your U-turn?
8  A.  In the far right lane.
9  Q.  The vehicle at some point maneuvered into the left lane?
10 A.  No.
11 Q.  Are you certain of that, officer?
12 A.  I am certain of that.
13 Q.  Okay.  So the vehicle remained in the far right lane for
14 the time that you were behind it?
15 A.  It eventually made a right turn on Market Place.
16 Q.  Okay.  And which lane did it make that right turn from?
17 A.  From the right lane.
18 Q.  Okay.  Was any other vehicle impeded by the making of that
19 right turn?
20 A.  Not that right turn, no.
21 Q.  Where did the vehicle turn into when it made that right
22 turn?
23 A.  The vehicle turned from Bollinger Canyon Road to Market
24 Place, that right turn.
25 Q.  Okay.  I'll try to be more clear in the way I phrase the

```
 1  questions.
 2       What lane was the vehicle in when it turned onto Market
 3  Place?
 4  A.   It was in the right lane and made a right turn onto Market
 5  Place and proceeded in the left lane of Market Place.
 6  Q.   Did you continue to follow the vehicle?
 7  A.   I did.
 8  Q.   Did the vehicle -- Did you pull the vehicle over at that
 9  time?
10  A.   Not at that time.
11  Q.   Did you subsequently observe the vehicle make any other
12  turns?
13  A.   Yes.  It made another right turn into the Valero gas
14  station.
15  Q.   Which lane was that vehicle in when it made the right turn
16  into the Valero gas station?
17  A.   In the left lane.
18           THE COURT:  Four lane road?
19           THE WITNESS:  It's two lanes.
20           THE COURT:  Two each way?
21           THE WITNESS:  It's two -- at least two going
22  southbound the way this vehicle was traveling.  I believe it was
23  two going northbound also.
24  By Mr. Graber:
25  Q.   So did the vehicle cut across the right lane when it made
```

```
 1  this right turn?
 2  A.   Yes.
 3  Q.   Did the vehicle impede any vehicles in the course of making
 4  that right turn?
 5  A.   Yes.  My vehicle.
 6  Q.   Did you have to do anything to avoid a collision with the
 7  suspect's vehicle at that time?
 8  A.   Yes.  I had to press on my brakes.
 9  Q.   Did you subsequently attempt to contact the driver of that
10  vehicle or make a traffic stop of that vehicle?
11  A.   Yes.
12  Q.   Did you activate your overhead lights in the process of
13  doing that?
14  A.   Yes.
15  Q.   Did you at any point make contact with the driver of that
16  car?
17  A.   Yes.
18  Q.   Do you see that person in court today?
19  A.   Yes.
20  Q.   Can you tell us where they are seated and describe an
21  article of clothing that person is wearing?
22  A.   The gentleman sitting at defense table with the black
23  striped jacket.
24          Mr. Graber:  May the record reflect identification of
25  the defendant.
```

```
 1            THE COURT:  The record will so reflect.
 2   By Mr. Graber:
 3   Q.   Did you notice anything about the defendant when you
 4   contacted him?
 5   A.   I noticed his eyes were red and watery.
 6            Ms. Garrido:  Objection, exceeds the scope of the
 7   hearing.
 8            THE COURT:  If I understand, Miss Garrido, you are
 9   challenging only up to the point where contact was made?
10            Ms. Garrido:  Yes, Your Honor, I do, and going past
11   that time but not relating to probable cause arrest for D.U.I.
12            Mr. Graber:  Nothing further.
13
14                        CROSS-EXAMINATION
15   By Ms. Garrido:
16   Q.   Good afternoon, officer.
17        Can you draw a map of the area that you just testified to,
18   using the paper behind you and the markers.
19   A.   Yes.  I'll try.  I'm a terrible artist.
20        Okay.  This would be the map.
21            THE COURT:  Use a different color pen, if you can, to
22   indicate the vehicle.
23            THE WITNESS:  Okay.  Actually, there would be a left
24   turn pocket here, which I didn't draw.
25            THE COURT:  Okay.
```

1  THE WITNESS: That's the map. This would be Bollinger
2  Canyon Road, this would be the westbound lanes, these being the
3  eastbound lanes. This is Market Place.
4  THE COURT: Market. Is the Valero station within
5  there?
6  THE WITNESS: Yes.
7  THE COURT: Okay.
8  By Ms. Garrido:
9  Q. And where were you when you first noticed Mr. Bhatnagar?
10 A. I was somewhere in this area.
11 Q. You were driving?
12 A. I was driving.
13 Q. And where was he when you first saw him?
14 A. He was at the light in the left-turn pocket.
15 Q. Was he stopped?
16 A. He was.
17 Q. The light was red?
18 A. I assume. I don't remember if the light was red. I assume
19 that's why he was stopped at it.
20 Q. Where had you been coming from?
21 A. I don't remember where I was before that. I was just
22 driving westbound on Bollinger Canyon.
23 Q. So can you just draw with a red marker where Mr. Bhatnagar
24 went from that point where he was stopped at the left turn lane?
25 A. Yes. He made a U-turn onto Bollinger Canyon; and like I

1  told the D.A., I don't know which lane he landed in, but then he
2  proceeded driving on the eastbound. That's when I -- well --
3          THE COURT: In the right-hand lane of eastbound?
4          THE WITNESS: Initially when he made the turn, I don't
5  know which lane he landed in 'till I got behind him, and then he
6  was in the right lane.
7  By Ms. Garrido:
8  Q.   At what point was that?
9  A.   Sorry?
10 Q.   At what point did you get behind him?
11 A.   Well, right after he made the turn, I went and made the
12 turn also.
13 Q.   Okay. So where was Mr. Bhatnagar when you noticed that he
14 was in the right lane and you were directly behind him?
15 A.   Somewhere in-between. It's a very short distance here, so
16 somewhere in-between -- you know -- Bishop Ranch and Market
17 Place. There is nothing in-between here, do it was before he
18 got to Market Place and after -- obviously, after Bishop Ranch.
19 Q.   Somewhere in the middle there?
20 A.   Yes, somewhere in-between Bishop Ranch and Market Place.
21 Q.   You don't want to draw something because you're not sure
22 exactly where?
23 A.   Well, it's a very, very short distance, maybe 200 yards, so
24 I don't know exactly where on that.
25 Q.   Okay. At some point you got directly behind him and then

```
 1  you testified earlier that he turned right onto Market Place,
 2  correct?
 3  A.   Yes.  He turned right onto Market Place.
 4  Q.   And you didn't pull him over at any point during any of
 5  this, correct?
 6  A.   Not at that point, no.
 7  Q.   It wasn't until he had turned into the Valero station that
 8  you pulled him over?
 9  A.   He actually stopped himself, I assume to get gas, but I had
10  intentions of pulling him over prior to his stopping himself.
11  That's why I had activated my emergency lights.
12  Q.   So you were right behind him at that time?
13  A.   Well, at the time in the Valero gas station?  I pulled up
14  right behind him, yes.
15  Q.   There were no other cars on the road at that point,
16  correct?
17  A.   I don't know if there were.  I assume there were other
18  cars, but there was no other cars impeding my vision of him or
19  anything like that.
20  Q.   So you could have pulled him over on Bollinger Canyon Road,
21  correct?
22  A.   It wouldn't have been a good officer safety decision if I
23  did that.
24  Q.   Okay.  Why is that?
25  A.   It's a more main street.  There is not a shoulder to pull
```

1 somebody over on. I also hadn't run the plate yet and had an
2 opportunity to see if it was stolen or anything like that.
3 Several officer safety issues at that point. I'd rather wait
4 'till we get somewhere where I'd rather stop somebody. That
5 wouldn't be a place where I would like to stop somebody.
6 Q.   What about on Market Place?
7 A.   There probably would be some good places to pull somebody
8 over in some area down in Market place. Valero, I would say, is
9 a good spot, but at that point he stopped himself, so I didn't
10 have a choice, really.
11 Q.   You can have a seat. Thank you.
12      Now, you testified that you turned on your light to signal
13 to Mr. Bhatnagar that you were making a traffic enforcement
14 stop?
15 A.   Correct.
16 Q.   And you wrote a report in this case, correct?
17 A.   Yes.
18 Q.   And you're trained to write as complete a report as
19 possible, aren't you?
20 A.   Yes.
21 Q.   And you are taught to include all relevant details,
22 correct?
23 A.   Yes.
24 Q.   And you're trained also to write it as close to the time of
25 the incident as possible, correct?

```
 1  A.   Yes.
 2  Q.   And in this case you wrote a partial report within about 19
 3  hours of the incident, correct?
 4  A.   Correct.
 5  Q.   And that's what appears on page one of your report; is that
 6  correct?
 7  A.   That would appear on page one.
 8  Q.   And then you finished the full narrative two days later,
 9  correct?
10  A.   I don't recall.  I have to check my report to see the times
11  on it.
12  Q.   If you would like to do that.
13  A.   Fine.
14       Yes.  Looks like at about 19 hours later is when -- the
15  time on the bottom of the report is about when you write it --
16  so it says 2000 hours, yes, which is 19 hours later.
17  Q.   Okay.  There is two different dates on there.  There is
18  May 20th and May 22nd, correct?
19  A.   I don't see May 22nd.
20  Q.   In box number 21 -- or is that just the date that it was
21  proofed?
22  A.   21.  That's the date the sergeant signed the report.
23  That's -- the date above that box 17 is when it was written.
24  Q.   How long after the event did you write the full narrative?
25  A.   About 19 hours later.  It would be my next shift.
```

```
 1  Q.    Now, there is a bar nearby to this area, correct?
 2  A.    Correct.
 3  Q.    What is that called?
 4         Mr. Graber:  Objection, relevance.
 5         THE COURT:  Overruled.
 6         THE WITNESS:  Do I answer?
 7         THE COURT:  Yes.
 8         THE WITNESS:  El Balazo.
 9  By Ms. Garrido:
10  Q.    How close in proximity is that to the Valero gas station?
11  A.    Directly across the street, across Market Place.
12        Yo want me to draw it?
13  Q.    Yes.
14  A.    It would be just a little bit over there.  Can you see
15  that?
16  Q.    Yes.  Okay.
17        Now, isn't it true that when you first pulled into the gas
18  station, Mr. Bhatnagar was already out of the car?
19  A.    No.  I have to look at my report.  I don't believe so.  May
20  I look at my report?
21  Q.    Sure.
22  A.    No, he was not out of his car.
23  Q.    Isn't it true that he was standing with a woman?
24  A.    There was no -- he was not standing with a woman.
25  Q.    Isn't it true he was standing with a white woman who was
```