```
 1          IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2            IN AND FOR THE COUNTY OF CONTRA COSTA

 3          BEFORE THE HON. CHARLES S. TREAT, JUDGE PRESIDING

 4                      ---oOo---

 5   PEOPLE OF THE STATE OF CALIFORNIA,)

 6                      PLAINTIFF, )

 7   VERSUS                         )     Case No. 127484-4

 8   ABHINAV BHATNAGAR,             )     1538.5 MOTION

 9                      DEFENDANT. )

10   _____ )

11            REPORTER'S TRANSCRIPT OF PROCEEDINGS

12                   November 27, 2006

13                   Department No. 12

14                Walnut Creek, California

15

16   Appearances:
     For the People:      ROBERT KOCHLY
17                        DISTRICT ATTORNEY
                          By:  Patrick Graber
18                        Deputy District Attorney

19
     For Defendant:       DAVID COLEMAN
20                        PUBLIC DEFENDER
                          By:  Diane Garrido
21                        Deputy Public Defender

22

23   Reported By:        Juanita Gonzalez

24                       CSR No. 3003

25
```

COPY

```
 1                        I N D E X

 2                     Direct   Cross  Redirect   Re-cross

 3  People's Witnesses:

 4  Officer Jason Ingrassia   4(Gr)   9(Gar) 21 (Gr)    23(Gar)

 5                                            25 (Gr)

 6                                            (Further)

 7  Defense Witnesses:

 8  Richard Ha              26(Gar)  29(Gr)

 9

10  Laurie Garrison         34(Gar)  37(Gr)

11

12  Abhinav Bhatnagar       39(Gar)  44(Gr)
```

```
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1  November 27, 2006                        Department No. 12

 2

 3         THE COURT:  People versus Abhinav Bhatnagar, 127484-4.

 4         Ms. Garrido:  My two witnesses are present in the

 5  courtroom.  I don't know if the People want to exclude.

 6         Mr. Graber:  Ask they be excluded.

 7         Ms. Garrido:  Wait in the hallway.  I will call you.

 8         THE COURT:  Thank you for drawing my attention to that.

 9         Is it stipulated the arrest was made without a warrant?

10         Mr. Graber:  It is.

11         THE COURT:  Proceed.

12         Mr. Graber:  Call officer -- May I ask, before we start

13  the evidence, what the scope of Miss Garrido's motion is?

14         Ms. Garrido:  Yes, Your Honor.  The motion focuses on

15  reasonable suspicion to detain Mr. Bhatnagar and does not focus

16  on any probable cause to arrest for a D.U.I. issue.  There are

17  other areas that I plan to explore regarding potential use of

18  racial profiling.

19         THE COURT:  All right.  Go ahead.

20         THE CLERK:  You do solemnly swear that the testimony

21  you shall give in the matter now pending before this Court,

22  shall be the truth, the whole truth, and nothing but the truth,

23  so help you God.

24         THE WITNESS:  I do.

25
```

1                    OFFICER JASON INGRASSIA,

2 called as a witness by the People, was duly sworn, and testified

3 as follows:

4        THE CLERK:  State your name and spell your name, for

5 the record.

6        THE WITNESS:  Jason Ingrassia, I-n-g-r-a-s-s-i-a, first

7 name, J-a-s-o-n.

8        THE COURT:  Before we begin, I had the impression from

9 your brief that there was an issue about possible racial

10 prejudice or disparate treatment.  I wasn't clear on whether

11 there was profiling as such.  That means assuming that a person

12 of a particular ethnic background is more prone to commit a

13 certain offence or something like that.  Also not clear whether

14 this is properly brought under 1538.

15        Ms. Garrido:  Well, Your Honor, perhaps we can discuss

16 this in chambers briefly.

17        THE COURT:  Okay.

18

19            (In-chambers conference was held

20              without the court reporter.)

21

22            (The following proceedings

23              were held in open court:)

24

25        THE COURT:   Mr. Graber, you may proceed.

```
 1                    DIRECT EXAMINATION
 2  By Mr. Graber:
 3  Q.    Officer, how are you currently employed?
 4  A.    I am a deputy sheriff for the Contra Costa County
 5  Sheriff's Department.
 6  Q.    And who is your actual employer in that relationship?
 7        Let me rephrase.
 8        Who do you actually work for?
 9  A.    I work for the sheriff's office.  I am currently assigned
10  to the City of San Ramon as a contract city.
11  Q.    And were you on duty May 20th, 2006 at approximately
12  1:08 A.M.?
13  A.    Yes.
14  Q.    Have you previously investigated driving under the
15  influence cases?
16  A.    Yes.
17  Q.    About how many have you done?
18  A.    I have conducted several D.U.I. investigations.   I don't
19  even know how many investigations.
20  Q.    Have all those investigations led to arrests?
21  A.    No.
22  Q.    Where were you located on May 20th about 1:00 in the
23  morning?
24  A.    I was driving westbound on Bollinger Canyon Road.
25  Q.    Were you wearing a full police uniform?
```

1    A.    Yes.

2    Q.    Were you in a marked police vehicle?

3    A.    Yes.

4    Q.    And is that in Contra Costa County?

5    A.    Yes.

6    Q.    About that time did any vehicle attract your attention?

7    A.    Yes.

8    Q.    Why did the vehicle attract your attention?

9    A.    The vehicle, which was a silver, Nissan Sentra, attracted

10   my attention because it made an illegal U-turn at the

11   intersection which was in front of me.

12   Q.    Do you recall which intersection that was?

13   A.    It was Bollinger Canyon Road at Bishop Ranch One East.

14   Q.    Is there a posted sign indicating that U-turns are not

15   permitted at that intersection?

16   A.    Yes.

17   Q.    Is making a U-turn when there is a posted sign indicating

18   it's not permissible, a violation of the California Vehicle

19   Code?

20   A.    Yes.

21   Q.    Do you recall what section?

22   A.    It's Vehicle Code 22107.   I would have to look to make

23   sure.

24   Q.    What did you do when you observed the vehicle make the

25   illegal U-turn?

1  A.    I made the same U-turn and got behind the vehicle.

2  Q.    Which lane did the vehicle turn into when it made its

3  U-turn?

4  A.    It turned into -- Well, initially, I don't know which lane

5  it turned into  -- so I don't know.

6  Q.    Which lane was the vehicle in when you observed it after

7  making your U-turn?

8  A.    In the far right lane.

9  Q.    The vehicle at some point maneuvered into the left lane?

10  A.    No.

11  Q.    Are you certain of that, officer?

12  A.    I am certain of that.

13  Q.    Okay.  So the vehicle remained in the far right lane for

14  the time that you were behind it?

15  A.    It eventually made a right turn on Market Place.

16  Q.    Okay.  And which lane did it make that right turn from?

17  A.    From the right lane.

18  Q.    Okay.  Was any other vehicle impeded by the making of that

19  right turn?

20  A.    Not that right turn, no.

21  Q.    Where did the vehicle turn into when it made that right

22  turn?

23  A.    The vehicle turned from Bollinger Canyon Road to Market

24  Place, that right turn.

25  Q.    Okay.  I'll try to be more clear in the way I phrase the

1 questions.

2     What lane was the vehicle in when it turned onto Market

3 Place?

4 A.   It was in the right lane and made a right turn onto Market

5 Place and proceeded in the left lane of Market Place.

6 Q.   Did you continue to follow the vehicle?

7 A.   I did.

8 Q.   Did the vehicle -- Did you pull the vehicle over at that

9 time?

10 A.   Not at that time.

11 Q.   Did you subsequently observe the vehicle make any other

12 turns?

13 A.   Yes.  It made another right turn into the Valero gas

14 station.

15 Q.   Which lane was that vehicle in when it made the right turn

16 into the Valero gas station?

17 A.   In the left lane.

18          THE COURT:  Four lane road?

19          THE WITNESS:  It's two lanes.

20          THE COURT:  Two each way?

21          THE WITNESS:  It's two -- at least two going

22 southbound the way this vehicle was traveling.  I believe it was

23 two going northbound also.

24 By Mr. Graber:

25 Q.   So did the vehicle cut across the right lane when it made

1 this right turn?

2 A.    Yes.

3 Q.    Did the vehicle impede any vehicles in the course of making

4 that right turn?

5 A.    Yes.  My vehicle.

6 Q.    Did you have to do anything to avoid a collision with the

7 suspect's vehicle at that time?

8 A.    Yes.  I had to press on my brakes.

9 Q.    Did you subsequently attempt to contact the driver of that

10 vehicle or make a traffic stop of that vehicle?

11 A.    Yes.

12 Q.    Did you activate your overhead lights in the process of

13 doing that?

14 A.    Yes.

15 Q.    Did you at any point make contact with the driver of that

16 car?

17 A.    Yes.

18 Q.    Do you see that person in court today?

19 A.    Yes.

20 Q.    Can you tell us where they are seated and describe an

21 article of clothing that person is wearing?

22 A.    The gentleman sitting at defense table with the black

23 striped jacket.

24        Mr. Graber:  May the record reflect identification of

25 the defendant.

```
 1          THE COURT:   The record will so reflect.

 2  By Mr. Graber:

 3  Q.   Did you notice anything about the defendant when you

 4  contacted him?

 5  A.   I noticed his eyes were red and watery.

 6          Ms. Garrido:   Objection, exceeds the scope of the

 7  hearing.

 8          THE COURT:   If I understand, Miss Garrido, you are

 9  challenging only up to the point where contact was made?

10          Ms. Garrido:   Yes, Your Honor, I do, and going past

11  that time but not relating to probable cause arrest for D.U.I.

12          Mr. Graber:   Nothing further.

13

14                      CROSS-EXAMINATION

15  By Ms. Garrido:

16  Q.   Good afternoon, officer.

17      Can you draw a map of the area that you just testified to,

18  using the paper behind you and the markers.

19  A.   Yes.   I'll try.   I'm a terrible artist.

20      Okay.   This would be the map.

21          THE COURT:   Use a different color pen, if you can, to

22  indicate the vehicle.

23          THE WITNESS:   Okay.   Actually, there would be a left

24  turn pocket here, which I didn't draw.

25          THE COURT:   Okay.
```

1          THE WITNESS:   That's the map.   This would be Bollinger

2   Canyon Road, this would be the westbound lanes, these being the

3   eastbound lanes.   This is Market Place.

4          THE COURT:   Market.   Is the Valero station within

5   there?

6          THE WITNESS:   Yes.

7          THE COURT:    Okay.

8   By Ms. Garrido:

9   Q.    And where were you when you first noticed Mr. Bhatnagar?

10  A.    I was somewhere in this area.

11  Q.    You were driving?

12  A.    I was driving.

13  Q.    And where was he when you first saw him?

14  A.    He was at the light in the left-turn pocket.

15  Q.    Was he stopped?

16  A.    He was.

17  Q.    The light was red?

18  A.    I assume.   I don't remember if the light was red.   I assume

19  that's why he was stopped at it.

20  Q.    Where had you been coming from?

21  A.    I don't remember where I was before that.   I was just

22  driving westbound on Bollinger Canyon.

23  Q.    So can you just draw with a red marker where Mr. Bhatnagar

24  went from that point where he was stopped at the left turn lane?

25  A.    Yes.   He made a U-turn onto Bollinger Canyon; and like I

1  told the D.A., I don't know which lane he landed in, but then he

2  proceeded driving on the eastbound.  That's when I -- well  --

3            THE COURT:  In the right-hand lane of eastbound?

4            THE WITNESS:  Initially when he made the turn, I don't

5  know which lane he landed in 'till I got behind him, and then he

6  was in the right lane.

7  By Ms. Garrido:

8  Q.   At what point was that?

9  A.   Sorry?

10 Q.   At what point did you get behind him?

11 A.   Well, right after he made the turn, I went and made the

12 turn also.

13 Q.   Okay.  So where was Mr. Bhatnagar when you noticed that he

14 was in the right lane and you were directly behind him?

15 A.   Somewhere in-between.  It's a very short distance here, so

16 somewhere in-between -- you know -- Bishop Ranch and Market

17 Place.  There is nothing in-between here, do it was before he

18 got to Market Place and after -- obviously, after Bishop Ranch.

19 Q.   Somewhere in the middle there?

20 A.   Yes, somewhere in-between Bishop Ranch and Market Place.

21 Q.   You don't want to draw something because you're not sure

22 exactly where?

23 A.   Well, it's a very, very short distance, maybe 200 yards, so

24 I don't know exactly where on that.

25 Q.   Okay.  At some point you got directly behind him and then

1  you testified earlier that he turned right onto Market Place,

2  correct?

3  A.    Yes.   He turned right onto Market Place.

4  Q.    And you didn't pull him over at any point during any of

5  this, correct?

6  A.    Not at that point, no.

7  Q.    It wasn't until he had turned into the Valero station that

8  you pulled him over?

9  A.    He actually stopped himself, I assume to get gas, but I had

10 intentions of pulling him over prior to his stopping himself.

11 That's why I had activated my emergency lights.

12 Q.    So you were right behind him at that time?

13 A.    Well, at the time in the Valero gas station?  I pulled up

14 right behind him, yes.

15 Q.    There were no other cars on the road at that point,

16 correct?

17 A.    I don't know if there were.   I assume there were other

18 cars, but there was no other cars impeding my vision of him or

19 anything like that.

20 Q.    So you could have pulled him over on Bollinger Canyon Road,

21 correct?

22 A.    It wouldn't have been a good officer safety decision if I

23 did that.

24 Q.    Okay.   Why is that?

25 A.    It's a more main street.   There is not a shoulder to pull

1  somebody over on.  I also hadn't run the plate yet and had an

2  opportunity to see if it was stolen or anything like that.

3  Several officer safety issues at that point.  I'd rather wait

4  'till we get somewhere where I'd rather stop somebody.  That

5  wouldn't be a place where I would like to stop somebody.

6  Q.   What about on Market Place?

7  A.   There probably would be some good places to pull somebody

8  over in some area down in Market place.  Valero, I would say, is

9  a good spot, but at that point he stopped himself, so I didn't

10 have a choice, really.

11 Q.   You can have a seat.  Thank you.

12      Now, you testified that you turned on your light to signal

13 to Mr. Bhatnagar that you were making a traffic enforcement

14 stop?

15 A.   Correct.

16 Q.   And you wrote a report in this case, correct?

17 A.   Yes.

18 Q.   And you're trained to write as complete a report as

19 possible, aren't you?

20 A.   Yes.

21 Q.   And you are taught to include all relevant details,

22 correct?

23 A.   Yes.

24 Q.   And you're trained also to write it as close to the time of

25 the incident as possible, correct?

A.    Yes.

Q.    And in this case you wrote a partial report within about 19 hours of the incident, correct?

A.    Correct.

Q.    And that's what appears on page one of your report; is that correct?

A.    That would appear on page one.

Q.    And then you finished the full narrative two days later, correct?

A.    I don't recall. I have to check my report to see the times on it.

Q.    If you would like to do that.

A.    Fine.

       Yes. Looks like at about 19 hours later is when -- the time on the bottom of the report is about when you write it -- so it says 2000 hours, yes, which is 19 hours later.

Q.    Okay. There is two different dates on there. There is May 20th and May 22nd, correct?

A.    I don't see May 22nd.

Q.    In box number 21 -- or is that just the date that it was proofed?

A.    21. That's the date the sergeant signed the report. That's -- the date above that box 17 is when it was written.

Q.    How long after the event did you write the full narrative?

A.    About 19 hours later. It would be my next shift.

1  Q.    Now, there is a bar nearby to this area, correct?

2  A.    Correct.

3  Q.    What is that called?

4          Mr. Graber:  Objection, relevance.

5          THE COURT:  Overruled.

6          THE WITNESS:  Do I answer?

7          THE COURT:  Yes.

8          THE WITNESS:  El Balazo.

9  By Ms. Garrido:

10 Q.    How close in proximity is that to the Valero gas station?

11 A.    Directly across the street, across Market Place.

12        Yo want me to draw it?

13 Q.    Yes.

14 A.    It would be just a little bit over there.  Can you see

15 that?

16 Q.    Yes.  Okay.

17        Now, isn't it true that when you first pulled into the gas

18 station, Mr. Bhatnagar was already out of the car?

19 A.    No.  I have to look at my report.  I don't believe so.  May

20 I look at my report?

21 Q.    Sure.

22 A.    No, he was not out of his car.

23 Q.    Isn't it true that he was standing with a woman?

24 A.    There was no -- he was not standing with a woman.

25 Q.    Isn't it true he was standing with a white woman who was

1  obviously drunk?

2  A.    He was not standing with a white woman that was obviously

3  drunk.

4  Q.    There was another officer present at the gas station,

5  correct?

6  A.    Yes.

7  Q.    And that was officer Jones.

8  A.    Yes.

9  Q.    Did that officer walk off with that woman?

10  A.    Which woman?  I said there wasn't a woman.  There was a

11  woman at the Valero gas station that was not with Mr. Bhatnagar.

12  Q.    There was a woman?

13  A.    There was a woman in the gas station, but she was not

14  standing with your client, as you asked me.  That's why I said

15  no.

16  Q.    You didn't conduct any D.U.I. investigation on that person,

17  did you?

18  A.    D.U.I., meaning driving under the influence?

19  Q.    That's correct.

20  A.    I did not witness her driving.

21  Q.    You asked Mr. Bhatnagar if he had come from the bar across

22  the street, didn't you?

23  A.    I don't recall asking him that.

24  Q.    Do you remember telling him that on weekends you would see

25  a lot of drunk people at that gas station coming from across the

1   street?

2           Mr. Graber:' Objection, relevance.

3           THE COURT:  Overruled.

4           THE WITNESS:  I don't remember saying that to him.

5  By Ms. Garrido:

6  Q.   Now, at some point you took Mr. Bhatnagar back to the San

7  Ramon police station, correct?

8  A.   Correct.

9  Q.   And he was upset, wasn't he?

10          Mr. Graber:  Objection, relevance, beyond the scope of

11 the hearing.

12          THE COURT: · Overruled.

13          THE WITNESS:  I don't know if he was upset.

14 By Ms. Garrido:

15 Q.   Was he crying?

16 A.   You know, I believe he was crying.

17 Q.   Did you witness him using his cell phone at any point?

18 A.   I let him use his cell phone, yes.

19 Q.   Isn't it true that you told him, "Stop crying, it's only a

20 misdemeanor, and even though you look like a terrorist, I'm not

21 charging you for that"?

22 A.   I didn't say that.

23 Q.   Isn't it true you told him, "Boy, take it easy.  You Asians

24 create a lot of trouble everywhere in the world and steal jobs

25 here"?

1  A.    No, I didn't say that.

2  Q.    Isn't it true that you yelled at him saying, "We're leaving

3  now, get going you terrorist"?

4  A.    No; that's not true.

5  Q.    Do you recall having any conversations regarding

6  Mr. Bhatnagar's ethnicity?

7  A.    No.

8  Q.    You sure about that?

9  A.    Am I sure about that?

10  Q.    Yes.

11  A.    I don't recall having any conversations with Mr. Bhatnagar

12  about his ethnicity.

13  Q.    Did you testify at Mr. Bhatnagar's DMV hearing?

14  A.    I did.

15  Q.    Do you recall telling the officer there, the DMV officer

16  there, that you did have conversations regarding Mr. Bhatnagar's

17  ethnicity?

18  A.    I don't recall that.

19  Q.    Would it refresh your recollection to hear your own

20  testimony on that day?

21  A.    Yes.

22  Q.    First I'm going to play the portion of the testimony you

23  began so you can identify whether in fact that is you.  Can you

24  hear that?

25  A.    Yes, ma'am.

1  Q.    Is that you, officer?

2  A.    Yes, ma'am.

3           THE COURT:  Can we have it stipulated that the reporter

4  need not transcribe the tape?

5           Ms. Garrido:  So stipulated.

6           Mr. Graber:  Yes, Your Honor.

7

8                    (Tape recording was played)

9

10 By Ms. Garrido:

11 Q.    Is it your testimony still that you did not have any

12 discussions with Mr. Bhatnagar regarding his ethnicity?

13 A.    I said I didn't recall, and this is how I remember it now.

14 Apparently a few months ago I thought I may have had a

15 conversation with him.  So the testimony is the same, yes.

16 Q.    Now after that DMV hearing, did you ever call Mr.

17 Bhatnagar?

18 A.    No.

19 Q.    You never called him in the middle of the night?

20 A.    No.

21 Q.    Never threatened him?

22 A.    No.

23 Q.    Never told him to watch his back?

24 A.    No.

25 Q.    Never told him he doesn't belong here?

1  A.    No.

2  Q.    On September 29, 2006 at about 2:00 a.m., did you see Mr.

3  Bhatnagar again?

4  A.    I saw him again.  I don't remember the date.  Seems about

5  the time I saw him again.

6  Q.    You saw him again in the Valero gas station, the same one?

7  A.    No.  It was near there.

8  Q.    And you pulled him over, correct?

9  A.    That is correct.

10  Q.    And you pulled him over for making an illegal U-turn,

11  didn't you?

12  A.    That is correct.

13  Q.    And when you approached Mr. Bhatnagar's driver's side

14  window, isn't it true you said, "What the fuck are you doing in

15  San Ramon?  I don't want to see you in San Ramon"?

16  A.    I never said that, no.

17  Q.    Isn't it true that he asked you what the problem was and he

18  told you he had been driving legally?

19  A.    I don't recall what he said to me.

20  Q.    Isn't it true that you said to him, "You're going to take

21  me to court.  You can't do anything to me.  I can take your ass

22  to jail any time.  I can take you to jail right now"?

23  A.    I didn't say that.

24  Q.    You wrote him a ticket, correct?

25  A.    Correct.

1  Q.    You told him not to come back do San Ramon, didn't you?

2  A.    No, I didn't say that.

3  Q.    And moving back to May 20th 2006, you never issued a

4  citation to Mr. Bhatnagar for making an illegal U-turn, did you?

5  A.    No, I didn't.

6          Ms. Garrido:   Nothing further.

7

8                    REDIRECT EXAMINATION

9  By Mr. Graber:

10 Q.    Officer, why didn't you issue the defendant a ticket for

11 making an illegal U-turn on May 20th?

12 A.    I was always trained to, if you pull somebody over for a

13 vehicle code violation and they end up being arrested for

14 driving under the influence, that we do not cite for the initial

15 vehicle violation, just mention it in the report.

16 Q.    Is it mentioned in your report?

17 A.    It is.

18 Q.    Turning back to the events of that day, do you remember how

19 far you were behind the defendant when he made the illegal

20 U-turn?

21 A.    I can't recall specifically.  I was within 100 feet, maybe.

22 Q.    What are the lighting conditions like on Bollinger Canyon

23 Road at one o'clock in the morning?

24 A.    It's fairly well lit with street lights.

25 Q.    Is it a well lit street compared to other streets at night,

1  or is it about as bright as it is during the daytime?

2  A.    Sorry.  I don't understand.

3  Q.    Would you say that Bollinger Canyon Road is as bright as it

4  in the daylight, at one o'clock in the morning with street

5  lights?

6  A.    No.

7  Q.    Do the street lights have any color tinting to them?

8  A.    White.

9  Q.    Okay.  You mentioned that there was a woman at the Valero

10  gas station during cross-examination.  You mentioned she wasn't

11  with the defendant.  However, do you recall about where she was

12  in the Valero gas station?

13  A.    When I saw her, she was standing at this entry door to the

14  little mini mart connected to the Valero gas station.

15  Q.    About how far away from Mr. Bhatnagar was that?

16  A.    20, 25, 30 feet.

17  Q.    At some point did other officer who was with you that night

18  contact that woman?

19  A.    I don't recall.

20  Q.    You did speak to Mr. Bhatnagar that night?

21  A.    Yes.

22  Q.    Do you remember the exact conversation you had with him?

23  A.    No.

24  Q.    Is it unusual to forget portions of conversations you have

25  with people you're contacting?

1  A.    Is it unusual to forget?  No, it's not.

2  Q.    Would you remember if you had referred to a person you

3  pulled over as a terrorist?

4  A.    I would probably remember that.

5  Q.    Is it your testimony today that you don't recall the

6  conversation with the defendant about his ethnicity, but that

7  one may have occurred; is that correct?

8  A.    Yes.

9  Q.    Nothing further.

10

11                    RE-CROSS EXAMINATION

12  By Ms. Garrido:

13  Q.    You just testified that you were within a hundred feet of

14  him when he made this alleged illegal U-turn, correct?

15  A.    Yes.

16  Q.    But weren't you where you marked your car when you saw him

17  make that turn?

18  A.    I think that's -- you asked me to mark my car when I first

19  saw him -- and I was driving; so I was mobile and he was

20  stationary.  I was closing in on him.

21  Q.    You drove within a hundred feet of him?

22  A.    I am saying within a hundred feet is when -- I was within

23  100 feet of him when he made the U-turn, not when I initially

24  saw him, which is where I marked.

25  Q.    Were you driving in the right lane?

```
 1  A.    I don't recall.

 2  Q.    Were you proceeding into the lane behind him to turn also?

 3  A.    Well, I wasn't going to until I saw the U-turn.   That's

 4  when I decided to follow him.

 5  Q.    So you were going to continue westbound?

 6  A.    Well, if I can assume, there is nothing to go left on.   I

 7  wouldn't go left there.   There is nothing back there to --

 8  closed businesses.

 9           THE COURT:   The question is, had you not seen an

10  illegal U-turn, would you have continued westbound on Bollinger.

11           THE WITNESS:   Well, I don't remember my train of

12  thought.   I would say yes.

13  By Ms. Garrido:

14  Q.    Okay.   Earlier you testified unequivocally that you had not

15  had any conversation with Mr. Bhatnagar regarding his ethnicity,

16  didn't you?

17  A.    Sorry.   Say that again.

18  Q.    You testified earlier that you had not had any conversation

19  with Mr. Bhatnagar regarding his ethnicity?

20           Mr. Graber:   Objection, misstates the testimony.

21           THE COURT:   Overruled.

22           THE WITNESS:   If that's what you said I said.

23           Ms. Garrido:   Nothing further.

24

25
```

```
 1                  REDIRECT EXAMINATION (FURTHER)

 2  By Mr. Graber:

 3  Q.    Do you have a specific recollection of your response to

 4  Miss Garrido's question, or basing it on her characterization?

 5  A.    I don't understand.

 6  Q.    Do you remember telling Miss Garrido unequivocally that you

 7  did not --

 8            THE COURT:  Mr. Graber, the transcript will reflect

 9  what his prior response was.

10            Mr. Graber:  Nothing further, then.

11            THE COURT:  Is the witness excused?

12            Mr. Graber:  Yes, subject to recall.

13            THE COURT:  Thank you, officer.  That means you are

14  still under subpoena.  If we need you we will contact you.

15  You're free to go.

16            THE COURT:  Any other witnesses?

17            Mr. Graber:  No, Your Honor.

18            Ms. Garrido:  Defense calls Richard Ha.

19            THE CLERK:  You do solemnly swear that the testimony

20  you shall give in the cause now pending before this Court, shall

21  be the truth, the whole truth, and nothing but the truth, so

22  help you God.

23            THE WITNESS:  Yes, ma'am.

24

25
```

1                    RICHARD HA,

2  called as a witness by the defense, was duly sworn, and

3  testified as follows;

4           THE CLERK:  Be seated.  State your name and spell your

5  first and last name, for the record.

6           THE WITNESS:  My name Richard Ha, H-a.

7           Mr. Graber:  May I have an offer of proof as to what

8  this witness will testify to?

9           Ms. Garrido:  Yes.  Mr. Ha works at the Valero gas

10 station and witnessed the entire event.

11          Mr. Graber:  Okay.

12

13                    DIRECT EXAMINATION

14 By Ms. Garrido:

15 Q.   Good afternoon.  Thank you for coming.

16 A.   Yes, ma'am.

17 Q.   Are you employed?

18 A.   Yes, I am.  Valero gas station.  I have been working there

19 a year.

20 Q.   Okay.  Is that Valero in San Ramon?

21 A.   Yes, ma'am.

22 Q.   And is that on the corner of Bollinger Canyon Road and

23 Market Place?

24 A.   Yes, ma'am.

25 Q.   And were you working on May 20th 2006 at about 1:00 in the

1  morning?

2  A.    Yes, ma'am.

3  Q.    And did you see Mr. Bhatnagar pull in for gas at about that

4  time?

5  A.    Yes.

6  Q.    Was an officer right behind him?

7  A.    At that time I went out to check the rest room, because

8  some of the -- from the bar -- customers from the bar --  the

9  gas station here, the bar there -- and a lot of people from the

10 bar come here to use the rest room, and some of the customers --

11 I went to the rest room and I saw him park in the station number

12 two, and I come back -- and before that I talk with the lady --

13 the girl -- I see she very drunk, and she asked me for a

14 cigarette, and at that time I don't have on me -- but I can't

15 take cigarettes from my store to give to.  I say, "I can't," and

16 she left.  She went out.  At the time, I went out too.  I

17 checked the rest room and I saw -- I think he talked with the

18 girl.  Right -- he talked with the girl.  The

19 girl, she was -- I think she asked him for money.

20 Q.    So she was asking him for money?

21 A.    Yes.

22 Q.    When you first say him.

23 A.    Yeah.  She asked him cigarette, something, or -- but I

24 think he refused, and after that I saw the police arrive.

25 Q.    But that was -- was that a couple of minutes later?

1  A.    Yeah, couple of minutes later, I think so.  I don't know

2  how long it was.  I can say like two, three minutes, something

3  like that.  I don't know.

4  Q.    And did the officer have his emergency lights on on his

5  car?

6  A.    You mean the light?

7  Q.    Yes.

8  A.    I don't know, no.  I don't see it.

9  Q.    And did you see the officer approach Mr. Bhatnagar?

10 A.    I think he asked him something.  He asked him he from the

11 bar or something.

12 Q.    He asked if Mr. Bhatnagar had come from the bar across the

13 street?

14 A.    Yes.  And then I think he asked him did he have a drink.  I

15 think he says yes.

16 Q.    If you could just hold off for a minute and just respond to

17 the specific questions that I ask you, I'd appreciate that.

18       Were there any other officers besides the one that was

19 talking to Mr. Bhatnagar?

20 A.    I think two officer.

21 Q.    And do you know what the other officer was doing?

22 A.    I think I saw that the girl -- I think she asked one

23 officer, but I don't know which one officer, for money for buy

24 cigarettes, something like that.

25 Q.    Okay.

1  A.    There were two officers.

2  Q.    Okay.  So one of the officers was talking to the woman and

3  the other one was talking to Mr. Bhatnagar?

4  A.    Yes.

5  Q.    Did you speak with Mr. Bhatnagar that night?

6  A.    You mean before?

7  Q.    Or on that night at all.

8  A.    No, I don't think so.

9  Q.    Did you know him at that point?

10 A.    No.

11 Q.    And you didn't actually speak to Mr. Bhatnagar 'till much

12 later, correct?

13 A.    Yes.

14 Q.    When was that?

15 A.    You mean I talk with him?

16 Q.    Yes.  Did he come to your gas station after that night?

17 A.    After that night.

18 Q.    He came in to ask you if you had video surveillance, right?

19 A.    He asked video, but I told him that the video outside --

20 I'm not sure, but I think it don't work.  So I give him my

21 manager phone number to him to ask to get the video.

22        Ms. Garrido:  Nothing further.

23

24

25

1                           CROSS-EXAMINATION

2  By Mr. Graber:

3  Q.    Mr. Ha, about -- let me rephrase.  Did you see Mr.

4  Bhatnagar that night before he pulled into your gas station?

5  A.    See him?

6  Q.    Yes.

7  A.    No.

8  Q.    And you had mentioned that after Mr. Bhatnagar had pulled

9  in your gas station that night, about two or three minutes later

10 an officer came to the gas station and spoke to him, correct?

11 A.    Yes.

12 Q.    What were you doing in-between when you first saw

13 Mr. Bhatnagar and when the officer arrived?

14 A.    I talk with one of the customers complain about rest room.

15 Q.    So Mr. Bhatnagar pulled in your gas station, you spoke with

16 the customer about the rest room, and then the officer pulled

17 in; is that correct?

18 A.    No.  Then the customer left about a couple of minutes later

19 and then I saw him --  before that I would talk with somebody

20 came to the gas station complain about the rest room -- it was

21 locked -- and then I walk out to check the rest room and then I

22 saw him park in the gas station, number two.

23 Q.    Okay.  So you spoke to the customer, went outside to check

24 the bathroom, and that's when you saw Mr. Bhatnagar's car,

25 correct?

```
 1  A.     Uh-hum.

 2            THE COURT:  Is that "yes"?

 3            THE WITNESS:  Yes.

 4            THE COURT:  The court reporter needs you to say yes or

 5  no.

 6            THE WITNESS:  Yes.

 7

 8  By Mr. Graber:

 9  Q.    Okay.  And then a couple of minutes later you saw the

10  officer pull in?

11  A.    I think so, yes.  Yes.

12  Q.    Okay.  What were you doing between when you went out --

13  those two or three minutes between when you saw Mr. Bhatnagar

14  and when you saw the officer pull in?  Were your checking the

15  rest room at that full time, or what?

16  A.    Between the two minutes?

17  Q.    Yes.

18  A.    I smoking.

19  Q.    So you smoked a cigarette?

20  A.    Yes.

21  Q.    And that only took you two or three minutes?

22  A.    Yes.  One, two minutes.

23  Q.    Where were you when you were smoking that cigarette?

24  A.    In front of the main door.

25  Q.    So you were outside?
```

1  A.    Outside.

2  Q.    And that main door overlooks the gas pumps?

3  A.    Yes.

4  Q.    About how far away from Mr. Bhatnagar and the police

5  officer were you when the officer started speaking with

6  Mr. Bhatnagar?

7  A.    How far?

8  Q.    Yes.

9  A.    About from here to here (indicating).

10  Q.    Okay.

11  A.    About five foot --

12  Q.    15, 20 feet maybe?

13  A.    15, 20 feet.

14          Mr. Graber:    The record should indicate that the

15  witness has indicated that the distance was from about the

16  witness stand to about defense counsel table.

17          THE COURT:    The record will so reflect.

18  By Mr. Graber:

19  Q.    Were you outside the entire time during this conversation,

20  or did you go back into the building?

21  A.    If I go back in the cashier?

22  Q.    Yes.

23  A.    I go back and I went out.  I go back, and I think after I

24  saw him, I go back -- and I went out when I saw him because I

25  saw him with the physical test -- you know -- I think the

1  police.

2  Q.    When he was doing sobriety tests?

3  A.    No, no.  Physical tests.

4  Q.    Having him walk in a straight line?

5  A.    Yes, something like that.  I saw that.  I go out.

6  Q.    Okay.  So you had gone back inside between when the officer

7  first was speaking to Mr. Bhatnagar, and then when you came out

8  a second time?

9  A.    Yes.

10 Q.    Could you hear the conversation between the two of them

11 while you were inside?

12 A.    Two of them?

13 Q.    Between Mr. Bhatnagar and the police officer, when you were

14 inside the gas station?

15 A.    No.

16 Q.    Do you have an estimate as to about how long it was between

17 when the officer and -- the officer began speaking to Mr.

18 Bhatnagar and when you came back outside?

19 A.    Not very long.  Couple of minutes.  Not that long.

20        Mr. Graber:  Nothing further.

21        Ms. Garrido:  Nothing further.

22        THE COURT:  Is the witness excused?

23        Ms. Garrido:  Yes.

24        THE COURT:  Thank you, Mr. Ha.  You may step down.

25 You're free to go.

1          THE WITNESS:  Thank you very much.

2          Ms. Garrido:  Defense calls Laurie Garrison.

3          THE CLERK:  You do solemnly swear that the testimony

4  you shall give in the matter now pending before this Court,

5  shall be the truth, the whole truth, and nothing but the truth,

6  so help you God.

7          THE WITNESS:  I do.

8

9                        LAURIE GARRISON,

10  called as a witness by the defense, was duly sworn, and

11  testified as follows:

12          THE CLERK:  Please be seated state and spell your first

13  and last name, for the record.

14          THE WITNESS:  Laurie, L-a-u-r-i-e, Garrison,

15  G-a-r-r-i-s-o-n.

16          THE COURT:  I see you're holding something which

17  appears to be a written statement.  If you could please put it

18  down, face down.

19          THE WITNESS:  Okay.

20

21                        DIRECT EXAMINATION

22  By Ms. Garrido:

23  Q.   Good afternoon.

24  A.   Afternoon.

25  Q.   Are you employed?

1 A.   Yes.

2 Q.   How are you employed?

3 A.   I'm employed as an associate architect for a private

4 architect.

5 Q.   Have you also served in the armed forces?

6 A.   I am in the U.S. Air Force Reserves currently.

7 Q.   Do you know Mr. Bhatnagar?

8 A.   Yes, I do.

9 Q.   And how long have you known him?

10 A.   Over three years now.

11 Q.   And what is the nature of your relationship?

12 A.   We're friends.

13 Q.   And did you have an opportunity to speak with Mr. Bhatnagar

14 on May 20th 2006 at around 2:00 in the morning?

15 A.   Yes, I did.

16 Q.   And did you speak with him over the telephone?

17 A.   Yes.

18 Q.   And did Mr. Bhatnagar sound upset?

19 A.   Yes.  In a way he sounded upset.  I think I was more upset.

20 Q.   You were more upset?

21 A.   Well --

22 Q.   What made you upset?

23 A.   He said he was being tested and arrested for D.U.I.

24 Q.   Okay.  So he was in police custody when you spoke to him?

25 A.   Yes.

1  Q.    Could you hear anyone in the background?

2  A.    Yes.    I could here one person speaking.    I believe it

3  sounded like they were speaking to Mr. Bhatnagar.

4  Q.    Was it a male voice?

5  A.    Yes.

6  Q.    And do you recall what that person was saying?

7  A.    Well, I recall that it was very kind of a violent voice,

8  and also made me upset.    I could hear that he was saying

9  something derogatory towards Asians, about them working around

10 the world and in this country.

11        Mr. Graber:    Objection to Miss Garrison's testimony as

12 irrelevant.

13        THE COURT:    Overruled.

14 By Ms. Garrido:

15 Q.    You may continue.

16 A.    Thank you.

17        It just sounded very prejudiced against Asians -- and I was

18 cut off briefly.    I remember being much more upset after he was

19 told to leave and get off the phone, and he said, "Come on,

20 we're going, you terrorist."    I was shocked -- just abruptly.

21 I wanted to talk more and find out what was going on, because he

22 didn't sound drunk at all.

23        Ms. Garrido:    Nothing further.

24

25

1                              CROSS-EXAMINATION

2   By Mr. Graber:

3   Q.   Miss Garrison, were you in Mr. Bhatnagar's car that night?

4   A.   No.

5   Q.   Did you observe him that night prior to him arriving at the

6   Valero gas station?

7   A.   No, not prior.  Earlier in the evening -- earlier that day

8   I believe he was in the -- it was in the afternoon.

9   Q.   Not immediately before seeing him at Valero?

10  A.   No.

11              Ms. Garrido:   Objection, relevance.

12              THE COURT:   Overruled.

13  By Mr. Graber:

14  Q.   And you went and spoke to him that night at the Valero gas

15  station?

16  A.   No.  It was all on the cell phone.

17  Q.   Okay.  So you didn't have any actual verbal contact with

18  Mr. Bhatnagar that night.

19  A.   Yes , I --

20  Q.   Until the phone call from the police station.

21  A.   No.  I spoke with him while -- prior to -- maybe it was

22  after -- yes -- he said something about being questioned, about

23  being drunk or driving, and he also said that he believed he

24  shouldn't be arrested because he was doing fine with the

25  testing.  So it was just after.

1          THE COURT:  That was during your cell phone

2 conversation?

3          THE WITNESS:  Yes, but that was at a separate cell

4 phone conversation while he was in the gas station.

5          THE COURT:  So you had two cell phone conversations?

6          THE WITNESS:  Yes.

7          THE COURT:  One while at the gas station and another

8 one while he was at the police station?

9          THE WITNESS:  Yes.

10         Mr. Graber:  Nothing further, Your Honor.

11         Ms. Garrido:  Nothing further, Your Honor.

12         THE COURT:  Is the witness excused?

13         Ms. Garrido:  Yes.

14         Mr. Graber:  Yes.

15         THE COURT:  Thank you, ma'am.

16         Ms. Garrido:  One moment, Your Honor.

17         Defense calls Mr. Bhatnagar.

18

19                    ABHINAV BHATNAGAR,

20 called as a witness on his own behalf, was duly sworn, and

21 testified as follows:

22         THE CLERK:  You do solemnly swear that the testimony

23 you shall give in the matter now pending before this Court, will

24 be the truth, the whole truth, and nothing but the truth, so

25 help you God.

1            THE WITNESS:  Yes, ma'am.

2            THE CLERK:  Please be seated and spell your first and

3  last name, for the record.

4            THE WITNESS:  My name is Abhinav Bhatnagar,

5  A-b-h-i-n-a-v, last name, B-h-a-t-n-a-g-a-r.

6

7                         DIRECT EXAMINATION

8  By Ms. Garrido:

9  Q.   Good afternoon, Mr. Bhatnagar.

10 A.   Good afternoon.

11 Q.   Where were you on May 20th 2006 at about 1:08 in the

12 morning?

13 A.   I was at the gas station.

14 Q.   Is that Valero gas station that has been drawn up there by

15 the officer?

16 A.   I could have been at one o'clock at the gas station.

17 Q.   Well, is it the gas station that's been drawn on the map by

18 the officer?

19 A.   Yes.

20 Q.   In San Ramon?

21 A.   Yes.

22 Q.   And did you park your car at a pump?

23 A.   Yes.

24 Q.   Did you go inside to pay?

25 A.   I was walking towards the cashier.

1 Q.    Did anyone approach you at that point?

2 A.    Yes.

3 Q.    Who was that?

4 A.    A Caucasian female who looked very intoxicated asked me for

5 some money.  I refused her.

6 Q.    And did a police officer pull in at some point?

7 A.    They came within two to three minutes, something like that,

8 approximately.

9         THE COURT:  Two to three minutes after you arrived?

10         THE WITNESS:  Yes.  I believe they were just right

11 there on the way.  When I pulled into the gas station -- I'm not

12 sure if the same police officer car -- but I could see a police

13 car already parked right near the washroom area.

14 Q.    You don't know if that was the same one?

15 A.    I'm not sure the same police officer.

16 Q.    Did the police officers who pulled into the gas station

17 have their emergency lights on?

18 A.    No.

19 Q.    And did that police officer get out of the vehicle?

20 A.    Yes.

21 Q.    And was that officer Ingrassia, who testified here today?

22 A.    Yes.

23 Q.    Were there any other officers present?

24 A.    Yes.

25 Q.    What was the other officer doing?

1  A.    He just walked in and started talking to the Caucasian girl

2  at the gas station.

3  Q.    And did they go off somewhere together?

4  A.    I believe he was talking to her.  I have no idea where they

5  went, but he was very friendly to her.

6  Q.    Did officer Ingrassia ask you anything at that point?

7  A.    Yes.   He asked me right away that "it's one o'clock.   Did

8  you come from across the bar?"  And I had no idea there was a

9  bar across from the gas station anyway.  I just went to get gas

10  here.  He said, "did you have alcoholic beverages?"  I said,

11  "yes," because  --

12  Q.    Answer only the questions that I ask you.

13  A.    Okay.

14  Q.    Now, did the officer take you back to the police station at

15  some point?

16  A.    Yes.

17  Q.    And how did you react to that?

18  A.    I was upset.  I was crying.

19  Q.    And did the officer say anything to you at that point?

20  A.    Very verbal abuse, like I thought I would have been beaten

21  up by just -- I'm still shaking.

22  Q.    It was only verbal, correct?

23  A.    Yes.

24  Q.    The officer never laid a hand on you?

25  A.    In a physical way he showed if I didn't cooperate he can

1  just  --

2  Q.   Did he ever call you a terrorist?

3  A.   Yes.

4  Q.   Did he accuse you of stealing jobs in this country?

5  A.   Yes.

6          THE COURT:  I can't hear you.

7          THE WITNESS:  Sorry.  Yes.  Just stress.

8          THE COURT:  I understand.

9  By Ms. Garrido:

10 Q.   Were you on the telephone at any point while the officer

11 was saying these things?

12 A.   Yes.

13 Q.   Who had you called?

14 A.   I'd spoken to Miss Garrison, and also to my other friends,

15 too.

16 Q.   So Miss Garrison who just testified here today?

17 A.   Yes.

18 Q.   And after this incident, did you go back to the Valero gas

19 station?

20 A.   Yes.

21 Q.   And was that the first time you met Richard Ha, when you

22 went back there?

23 A.   I had seen him standing around during my physical test, I

24 recollect.

25 Q.   You didn't speak with him, actually, did you?

1  A.    No, but I spoke to him after couple of days.

2  Q.    You went back a couple of days later?

3  A.    Yes.

4  Q.    And did you end up seeing the officer again on September

5  29th of this year?

6  A.    Yes.

7  Q.    And did the officer pull you over that day?

8  A.    Yes.

9  Q.    And what did he say to you when he pulled you over?

10 A.    Well, "Do you remember me?"  I said," yes."

11        "What are you doing in San Ramon?  I don't want to see you

12 in San Ramon.  I'll break your bones and no lawyer can do

13 anything to me--" because prior to that I had seen him at the

14 DMV hearing, and he said, "I can take you to jail even right

15 now," and very abusive terms I don't like to use.  Sorry.  But

16 he said "fuck" and all that stuff.

17 Q.    Okay.

18 A.    That's to the best of my recollection.

19 Q.    And when he let you go, did he say anything to you?

20 A.    He said, "I don't want to see you in San Ramon."  I told

21 him that I just went to the gas station again.  There was a

22 reason for me to go back to that location.

23 Q.    Nothing further.

24 A.    Thank you.

25

```
 1                        CROSS-EXAMINATION
 2  By Mr. Graber:
 3  Q.    Mr. Bhatnagar --
 4  A.    Yes.
 5  Q.    -- were you driving on Bollinger Canyon Road that night?
 6  A.    Yes.
 7  Q.    And did you make a U-turn at Bishop Ranch Road?
 8  A.    I never made a U-turn.
 9  Q.    So you were going southbound on Bollinger Canyon?
10  A.    No.   I was going towards the freeway, which should be
11  towards the westbound --
12  Q.    Okay.
13  A.    -- Bollinger.
14  Q.    Sorry.   I was reading my directions incorrectly.
15  A.    I had gone to the gas station many times prior for gas.   I
16  knew that location well.
17  Q.    You were heading westbound?
18  A.    Yes.
19  Q.    How did you get to the Valero if you didn't ever make a
20  U-turn?
21  A.    I turned left at Market where the gas station is at that
22  intersection.   So the Market Place to intersection of Bollinger,
23  the gas station is right there at the corner.   I just turned
24  left and got into the gas station.
25  Q.    You were going westbound on Bollinger Canyon Road, turned
```

```
 1  left on Market Place and then right into the Valero?

 2  A.    Yes.

 3  Q.    And had you been drinking that night?

 4  A.    Sorry?

 5        Ms. Garrido:  Objection, relevance, exceeds the scope.

 6        THE COURT:  Overruled.

 7        THE WITNESS:  Yes.

 8  By Mr. Graber:

 9  Q.    Were you feeling the effects of that alcohol at all?

10  A.    Not at all.

11  Q.    Now, you said that the officer who contacted you was

12  officer Ingrassia?

13  A.    Yes.

14  Q.    Did he use any of these, what you termed "verbally abusive

15  terms" to you while you were at the Valero gas station?

16  A.    He said it at the police station.

17  Q.    So all of that happened after the arrest?

18  A.    Yes.  Since I was crying at the gas station, because my

19  grandmother she was at her last stage too.  She is in India --

20  in her last stage -- unfortunately, she died, too, so I had to

21  attend the funeral, too.

22  Q.    Sorry for your loss.

23  A.    Fine.

24  Q.    Were any other officers present when officer Ingrassia used

25  the offensive language?
```

1  A.    No.  He was the only officer, and I was scared.  I wanted
2  to call -- I wish there was someone else.
3  Q.    Was the Caucasian woman at the gas station still speaking
4  to you when the officer arrived?
5  A.    She started walking.  She was mumbling.  She said some
6  other things -- "are you gay or something?"  Sorry.  I flatly
7  refused her.  She was very aggressive, and I just kind of
8  respect women anyway.  That's my culture.  I was trying to be
9  polite to her.
10           THE COURT:  Mr. Bhatnagar, I think you misunderstand
11  the question.  The question was one of timing.  Were you still
12  speaking with the woman when officer Ingrassia approached you?
13           THE WITNESS:  I believe so.
14  By Mr. Graber:
15  Q.    That was as you were walking to the cashier?
16  A.    Yes.
17  Q.    This was before you began pumping the gas?
18  A.    First I was going to use my credit card, but then I had
19  cash.  I Wanted use the cash because my credit card was kind
20  of --  It was a minute at least by the time I started walking to
21  the cashier and another minute, and within that minute the
22  Caucasian girl approached me.
23  Q.    So as you were walking to the cashier, the woman approached
24  you and asked you for money, you refused to give her any, and
25  the officer arrived as you were refusing her?

1  A.    Shortly arrived.  She was very aggressive, smiling with me,

2  and trying to persuade me to give her money.

3  Q.    It wasn't just a brief conversation; there was some dialog

4  between the two of you?

5  A.    She kept on asking.  I was trying to be polite.  I knew she

6  was very intoxicated.  You don't want to argue when someone

7  doesn't look normal.

8  Q.    Then as that conversation ended, the officer arrived and

9  contacted you?

10  A.    Almost ended, and the officer thought the girl was with me

11  initially.

12  Q.    What was the lighting like at the Valero gas station?

13  A.    It's very clear.

14  Q.    And about how far were you from the road as you were

15  entering the Valero gas station?

16  A.    Sorry?

17  Q.    About how far were you from Market Place when you were

18  entering the gas station?

19            THE COURT:  Entering the gas station from Market.

20            Mr. Graber:  Yes.

21            THE WITNESS:  It's right there at Market Place.

22  By Mr. Graber:

23  Q.    Is it five feet?  The actual building where the gas station

24  is housed, is that five feet from Market Place, is it 20 feet up

25  the driveway?

1  A.    I would say five or 10 feet, very close by.  Just turn left

2  and the gas station is there.

3  Q.    So as you enter the physical building at the gas station to

4  pay the cashier, would you be facing Bollinger Canyon Road,

5  Bishop Ranch Road, or Market Place?

6  A.    Facing the cashier.  That was diagonal to the  --

7  Q.    So it would be facing northwest?

8  A.    I believe so, yes.

9  Q.    Somewhat away from Market Place?

10  A.    Not away.  Just -- I am at the Market Place, technically.

11  The address is Market Place, so I was towards the cashier.

12  Q.    Yes.

13  A.    To that direction.

14  Q.    As you're facing the cashier, you would be facing

15  northwest?

16  A.    Not sure.

17        Ms. Garrido:  What's the relevance of this?

18        THE WITNESS:  I don't work there or live there.

19        THE COURT:  Hang on.  Overruled.  Perhaps if you could

20  indicate which -- on the map -- which direction does the front

21  of the gas station building face.

22        THE WITNESS:  This is the gas station, Your Honor, and

23  this is the cashier, and these are the gas pumps here and here.

24  I was on the right side of the gas station on station number

25  two, if I remember.  You turn left on Market Place, just right

1  there to the gas station.

2          THE COURT:  So the front of the gas station faces

3  towards Bishop Ranch?

4          THE WITNESS:  No.  It would be facing towards opposite,

5  because this is  --

6          THE COURT:  Faces towards Market Place?

7          THE WITNESS:  It would be facing towards the bar which

8  is right across the gas station.

9          THE COURT:  So southeast?

10         THE WITNESS:  Sorry.

11         Mr. Graber:  Nothing further.

12         Ms. Garrido:  Nothing further.

13         THE COURT:  Thank you.  You may step down.

14         THE COURT:  Any further witnesses?

15         Ms. Garrido:  No, Your Honor.

16         THE COURT:  Rebuttal?

17         Mr. Graber:  No, Your Honor.

18         THE COURT:  All right.  I'll hear arguments.

19         Ms. Garrido:  Your Honor, I believe there is serious

20 questions here as to the officer's credibility.  I believe that

21 Mr. Richard Ha's testimony was credible.  He happened to be at

22 the wrong place at the wrong time, and not necessarily wanted to

23 come and testify, but he had never met Mr. Bhatnagar before, had

24 no motive to make something up, and his testimony directly

25 contradicts the testimony of the officer.

1           THE COURT:  How so?

2           Ms. Garrido:  Because he stated that -- Well, first,

3   that Mr. Bhatnagar came into the gas station at least two to

4   three minutes prior to the officer ever pulling in; whereas the

5   officer testified that he was so close on Mr. Bhatnagar's tail

6   that he had to brake to avoid colliding with him as they entered

7   the gas station at the same time.

8           Second, Richard Ha testified that the officer did not

9   have his lights on, and the officer testified that he did have

10  his emergency lights on.

11          Third, he testified that Mr. Bhatnagar was speaking

12  with this woman who was present at the gas station that night.

13  The officer testified that Mr. Bhatnagar was not speaking with

14  this woman when he approached him.  He also heard the officer

15  say as he went up to Mr. Bhatnagar if he had just come from the

16  bar across the street, which the officer declined to comment on

17  whether or not he had ever asked Mr. Bhatnagar that.

18          THE COURT:  That's not a conflict.

19          Ms. Garrido:  Well  --

20          THE COURT:  It is inconsistent with the testimony that

21  the officer saw the defendant make a U-turn.  He wouldn't have

22  occasion to ask that question if that were true.

23          Ms. Garrido:  It's inconsistent in that sense, you're

24  right, Your Honor.

25          So I believe that Mr. Ha's testimony is materially

1  different in several respects.  And you have also heard

2  testimony from Mr. Bhatnagar, who stated he made a left turn

3  onto Market Place and went into the gas station; and it wasn't

4  until after that fact that the officer approached him, and for a

5  reason unrelated to his alleged illegal U-turn, which it's the

6  defense's contention that never occurred.  The officer also

7  admitted at the DMV hearing that he had been having conversation

8  with Mr. Bhatnagar about his ethnicity.

9       THE COURT:  That's not what I heard on the tape.  I

10  heard the tape.  You can play it if you think I misheard it.

11  The officer said that he had had some conversations, but when

12  further asked if they were about ethnicity, he said he didn't

13  remember that.

14       Ms. Garrido:  If I could re-play it, Your Honor.

15       THE COURT:  Please do.

16

17                 (Tape played)

18

19       THE COURT:  That's the way I remember it.

20       Ms. Garrido:  Your Honor, he is clearly stating that he

21  remembers that there was a conversation regarding

22  Mr. Bhatnagar's ethnicity, and he took the stand and he said

23  that that never happened.

24       THE COURT:  He did take the stand and clearly denied

25  that there had been discussion concerning ethnicity and there

1  had been two other witnesses that suggest -- who stated that

2  there was.  Frankly, I don't take that to be inconsistent with

3  his DMV testimony.  I don't think he was quite answering the

4  question that was asked him, when he said there had been

5  conversation, but he didn't remember the substance of it.

6          Ms. Garrido:  I'd like to have that recorded for the

7  record, if I can, at this point.

8          THE COURT:  All right.

9          Ms. Garrido:  I would like to note also that

10 Mr. Ha testified that the officer pulled in, he pulled his car

11 in front of Mr. Bhatnagar's car, where the officer testified

12 that he pulled in behind Mr. Bhatnagar.  There are several

13 factual inconsistencies on here which point to the reason for

14 the stop having been fabricated.

15          There are several conversations here that took place.

16 Miss Garrison overheard one of these on the telephone that

17 indicate that the officer was biased against Mr. Bhatnagar

18 because of his ethnicity, and that gave him ample motive to

19 create this reason for the stop.

20          He went in there fishing for somebody having just come

21 from across the bar and he singled Mr. Bhatnagar out, even

22 though there was a white woman who was obviously intoxicated,

23 and he singled Mr. Bhatnagar out for investigation for D.U.I.

24 and proceeded to, over the course of the evening, berate him and

25 call him very unflattering, ethnic slurs.

1          And, of course, racial profiling is prohibited by

2   statute.  That would be Penal Code 13519.4.  It's not a proper

3   means to stop somebody; and, in fact, there was no reason to

4   stop and detain Mr. Bhatnagar.  All he was doing was being in

5   the gas station across from the bar when the officer went up to

6   him and began questioning him.  There must be a reason to

7   believe that there is criminal activity before an officer can

8   approach someone.

9          Finally, where there is evidence here that the reason

10  for the stop was fabricated, suppression is the proper ground.

11  And I would cite People versus Rodriguez for that, nd that's

12  143 Cal.App.4, 1137.

13          THE COURT:  Volume?

14          Ms. Garrido:  143 Cal.App.4, 1137.

15          That's it.

16          Mr. Graber:  I would first note, Your Honor, that while

17  there were some factual inconsistencies between the statements,

18  I believe, virtually all of those -- between Mr. Ha and the

19  officer's statements -- virtually all of those can be explained

20  by lapses in memory that occur over a six-month period.  There

21  is nothing to suggest Mr. Ha's being more truthful or his

22  recollection is any better than the officer's as to whether the

23  officer parked in front of or behind the defendant at the gas

24  station, or for that matter, the precise timing of the events.

25          Mr. Ha testified that he was outside for approximately

1  two or three minutes, there was about two or three minutes
2  between when the defendant arrived and when the officer arrived.
3  He also stated that it took him two or three minutes to smoke a
4  cigarette. I'm not an expert in cigarette smoking, but I
5  believe anybody who is, knows it takes more than two minutes to
6  smoke a cigarette.

7      Ms. Garrido: Objection. No testimony as to that.

8      Mr. Graber: I would ask the court take knowledge.

9      THE COURT: I can't take judicial notice of that, but I
10 take your point. You're allowed to argue the credibility of
11 what the testimony was.

12     Mr. Graber: Mr. Ha appears to be well intentioned. I
13 suspect he is also somewhat mistaken about the precise events
14 that occurred that night. His recollection of the events, or at
15 least his statement of those events from the witness stand, was
16 somewhat less than clear over the course of his testimony. He
17 made several statements that contradicted himself, and I think
18 we were eventually able to get a basic idea what was going on
19 that night, but Mr. Ha appeared far from clear as to the exact
20 details of the events of that night.

21     THE COURT: It appeared to me that Mr. Ha had a fairly
22 good understanding of what was being said to him in English.
23 His ability to express himself in English was less good.

24     Mr. Graber: Yes. I would agree with that.
25 Additionally, if everything that the defense has said -- and

1  I'll put aside the allegations of racial animus for a moment --

2  if everything about the events of this incident are accurate as

3  explained by the defense counsel and defense witnesses, an

4  officer drove up to an individual who is stopped at a gas

5  station, that individual was outside of his vehicle, and

6  contacted by the officer. At no time did the officer activate

7  his emergency lights or his emergency sirens. At that point the

8  officer up to and individual, spoke to him, during which time

9  the officer observed something which led him to continue to

10 investigate.

11      Now, we can explore the issue of what precisely he

12 observed any further, if the defense counsel calling felt that

13 to be beyond the scope of this particular hearing as to the

14 exact facts.

15      As described, officer Ingrassia's contact with the

16 defendant was a consensual encounter.  While Ms. Garrido is

17 absolutely correct that an officer has to have some reason to

18 detain an individual, they do not have to have any reason at all

19 to consensually contact an individual on the street, to go up to

20 them and speak to them.  If that person converses back, that is

21 perfectly consensual and nothing barring that conversation from

22 taking place.

23      Even if you believe everything the defense witnesses

24 have testified to -- Mr. Ha has testified to today -- there is

25 nothing indicating an improper or an illegal contact between the

1 | officer and the defendant in this case.

2 |          Additionally, I would note, that at no point does
3 | anybody accuse officer Ingrassia of saying anything
4 | inappropriate at the gas station.  Any suggestions of
5 | inappropriate comments were made well afterwards, after the
6 | defendant was taken to the police station.  That's if we believe
7 | everything that the defendant and one witness had said, and
8 | that's if you believe that the witness heard officer Ingrassia
9 | make those statements.

10 |          All she was able to testify to was that she heard a
11 | male voice.  She never indicated any -- anybody to identify that
12 | male or that that male voice indicated who that person was,
13 | making her testimony, while relevant to the issue of somebody's
14 | bias, virtually impossibly relevant to the issue of
15 | officer Ingrassia.

16 |          Additionally, officer Ingrassia testified in a manner
17 | that I believe to be credible as to the events of that night and
18 | the events as he recalls them; that he observed the defendant
19 | making an illegal U-turn on Bollinger Canyon Road, turn right
20 | onto Market, making a sharp right turn from the left hand lane
21 | and pulling into Valero.  A short time later the officer
22 | followed in.

23 |          I believe that the only testimony in this case is
24 | somewhat compromised by alcohol or inability -- the witness'
25 | inability to express themselves clearly and unequivocally in

1  English and at least estimate time as it relates in English.

2  Given those facts, the officer's testimony is credible, should

3  be believed by the Court, at least for probable cause -- for a

4  preponderance determination; and that there has been sufficient

5  evidence to support the arrest in this case.  Given those facts,

6  the People move to dismiss this complaint -- this motion to

7  suppress.  I'll strike that last --

8          Ms. Garrido:  Your Honor, if I may respond briefly.

9  First, the officer's recollection of what happened exactly prior

10  to his stopping or contacting Mr. Bhatnagar in the Valero gas

11  station is certainly much less clearer than Mr. Graber would

12  suggest.

13          He didn't remember where he was coming from or what

14  lane he turned around to or what point he caught up to

15  Mr. Bhatnagar.  He also testified that as he went into the gas

16  station, he was directly behind Mr. Bhatnagar; he was so close

17  to him that he could barely avoid hitting him.  He must have

18  been right there, could not have a two or three minute gap or

19  really any gap at all.

20          I think that differences aside, how long it takes to

21  smoke a cigarette, where I can certainly tell you that I have

22  smoked a cigarette in less than two minutes, one cigarette can

23  go very quickly, and that's common sense also, there is a gap of

24  time here that Mr. Ha's testified to that I think is real, and

25  it's difficult to overcome if you accept the officer's

1  testimony.

2      And whether or not from that point on it was consensual

3  or what not, is irrelevant.  As People versus Rodriguez holds,

4  whenever an officer fabricates the reason for a stop, all of the

5  evidence deriving from that point on must be suppressed, and

6  that's because that is a very serious violation of the Fourth

7  Amendment.  And I would quote from that opinion:  "Failing to

8  invoke the most drastic remedy available to the Court that would

9  have the effect of legitimizing -- conduct on the part of the

10  police and permitting them to conduct a traffic stop for any

11  reason or no reason at all in contravention of leading United

12  States and California Supreme Court opinions.  In that case the

13  main factors that the Court considered were the fact that no

14  traffic citation was issued for the offense.

15      THE COURT:  They never issue traffic citation for

16  D.U.I.  Never seen them do it.

17      Ms. Garrido:  I have seen a couple of tickets, which

18  include not only the D.U.I., but also the reason why the person

19  was initially stopped.  I have seen it on a couple of occasions

20  where there is testimony to the contrary as there was in

21  Rodriguez, and I think makes it very difficult to believe the

22  officer's version of that.  I think, suppression is required.

23      Submitted.

24      Mr. Graber:  Briefly.  I would like to be heard on

25  the -- I am somewhat at a disadvantage, given Miss Garrido gave

1  the People no notice about People versus Rodriguez.  I had no
2  opportunity to actually review the case.  However, given the
3  portion Miss Garrido read, it suggests that the purpose for the
4  ruling was based -- was a stop based on race or a racial
5  profiling stop, not simply any level of racial animus.

6          I would note for the Court that the testimony from the
7  defendant himself is that at the time of this incident he was
8  facing away from the street speaking to an individual or walking
9  into a building that would have required that he be facing away
10 from the street to walk into.  The officer would have had no
11 means to observe the defendant's racial background from the
12 street as he was driving past at the speed limit and thus would
13 suggest that racial profiling would not and could not have been
14 the cause of the stop.

15          Submitted.

16          Ms. Garrido:  Just briefly.  Rodriguez does not have to
17 do with racial profiling.  The issue was whether if an officer
18 fabricated the grounds for a stop, if there was subsequent
19 discovery, would warrant -- would the fabrication of the stop
20 still require suppression, and the court held that it did.

21          The court:  Submitted.

22          Ms. Garrido:  Yes.

23          Mr. Graber:  Yes.

24          THE COURT:  1538.5 motion is granted.

25          Do you have any other evidence?

1          Mr. Graber:  No, Your Honor.

2          THE COURT:  Case is dismissed.

3          Mr. Graber:  May I ask the court's reasoning for the

4   granting of the motion?

5          THE COURT:  I do not credit the officer's testimony.

6   It appears to me as most credible, that the officer was trolling

7   for drunk drivers across from the bar and picked on this

8   defendant because of his race.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1
 2   STATE OF CALIFORNIA )
 3                       )  ss.
 4   CONTRA COSTA COUNTY )
 5
 6            I, JUANITA GONZALEZ, do hereby certify;
 7            That I am a Certified Shorthand Reporter of the
 8   State of California; that I was duly appointed shorthand
 9   reporter by the above-named Court in the foregoing entitled
10   Court and cause;
11            That I fully, truly and correctly took down in
12   shorthand writing all of the proceedings had and all of the
13   testimony given in said Court and cause, at the hearing in said
14   matter;
15            That I thereafter fully, truly and correctly
16   transcribed the same into typewriting, that the foregoing is a
17   full, true, and correct transcript of my shorthand notes taken
18   at said hearing and at the time and place therein named.
19
20                        IN WITNESS WHEREOF, I have hereunto set
21                        my hand this 27th day of December, 2006
22
23            _____
24            JUANITA GONZALEZ
25            CSR NO. 3003
```