1

1    IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

2    IN AND FOR THE COUNTY OF CONTRA COSTA

3    HONORABLE NANCY DAVIS STARK, JUDGE, PRESIDING

4    DEPARTMENT 20

5

6    THE PEOPLE OF THE STATE OF    )

7    CALIFORNIA,                   )

8              Plaintiff,          )

9         vs.                      )    No. **5-070257-1**

10   **RICHARD EUGENE SMITH,**          )

11             Defendant.          )

12   _____   )

13

14

15        REPORTER'S TRANSCRIPT OF PROCEEDINGS

16             **AUGUST 8, 2007**

17        COURTHOUSE, MARTINEZ, CALIFORNIA

18

19              A P P E A R A N C E S

20   For the People:    ROBERT J. KOCHLY, DISTRICT ATTORNEY

21                      BY:  BRETT WASLEY

22                      Certified Law Clerk

23                      Contra Costa County

24

25   For the Defendant:    ALTERNATE DEFENDER'S OFFICE

26                      BY:  TIM AHEARN

27                      Alternate Defender

28                      Contra Costa County

_MONICA D. POPPER – CERTIFIED SHORTHAND REPORTER #12816_

2

INDEX OF WITNESSES

PEOPLE OF THE STATE OF CALIFORNIA:

E X A M I N A T I O N

| | Direct | Cross | Redir | Recrs | V/D |
|---|---|---|---|---|---|
| Jason Ingrassia | 5 | 9 | 25 | 28 | |


INDEX OF WITNESSES

DEFENDANT RICHARD EUGENE SMITH:

E X A M I N A T I O N

| | Direct | Cross | Redir | Recrs | V/D |
|---|---|---|---|---|---|
| Abhinav Bhatnagar | 31 | 41 | | | |
| Raymond Eli | 47 | 50 | | | |
| Richard Smith | 54 | 57 | | | |

3

1                          INDEX OF EXHIBITS

2    PEOPLE OF THE STATE OF CALIFORNIA:

3                                            Marked      Received

4            (None marked)

5

6

7

8                          INDEX OF EXHIBITS

9    DEFENDANT RICHARD EUGENE SMITH:

10                                           Marked      Received

11           (None marked)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

AUGUST 8, 2007                                      P.M. SESSION

                              ---oOo---

                     P R O C E E D I N G S


          THE COURT:    We're on the record.    This is People

vs. Richard Eugene Smith, 5-070257-1.

          Appearances, please.

          MR. WASLEY:    Brett Wasley, certified law clerk for

the People.    The last name is W-A-S-L-E-Y.    And I'm supervised

by Dan McConkie.

          MR. AHEARN:    And Tim Ahearn from the Alternate

Defender's Office appearing with Mr. Smith, who appears before

the Court in custody.

          THE COURT:    Okay.    The matter is on for 1538.5 only,

and I have read the prosecution and defense brief, and I'm

prepared to begin.    Are you?

          MR. WASLEY:    Yes, your Honor.

          THE COURT:    Okay.    You may call your witness.

          MR. WASLEY:    At this time, the People call Deputy

Ingrassia.

          THE CLERK:    Please raise your right hand.

                       **_JASON INGRASSIA_**

          _called as a witness, having been duly_

          _sworn, testified as follows:_

          THE CLERK:    Thank you.    Please be seated.

          Please state your name for the record, spelling both

your first and last name.

          THE WITNESS:    My name is Deputy Jason Ingrassia,

_MONICA D. POPPER – CERTIFIED SHORTHAND REPORTER #12816_

1    J-A-S-O-N.  Last name is I-N-G-R-A-S-S-I-A.

2              THE COURT:  Okay.  Deputy, that's a voice-activated

3    microphone, so if you turn your head, it's not going to hear

4    you.

5              THE WITNESS:  Okay.

6              THE COURT:  So you want to keep it close to you.

7    That's also true, Mr. Ahearn.  I've noticed defense attorneys

8    don't realize that when they're talking to clients, I'm

9    hearing it all over the place.  So it's voice-activated.

10             Okay.  Go ahead.

11             MR. WASLEY:  Thank you, your Honor.

12                        DIRECT EXAMINATION

13   BY MR. WASLEY:

14        Q.   Good afternoon, Deputy.

15        A.   Good afternoon.

16        Q.   Where do you work?

17        A.   Right now, I work at the Martinez Detention

18   Facility.

19        Q.   And prior to that, where did you work?

20        A.   Prior to that, I was assigned to patrol in the City

21   of San Ramon.

22             THE COURT:  Who do you work for?

23             THE WITNESS:  I work for the Contra Costa County

24   Sheriff's Department.

25   BY MR. WASLEY:

26        Q.   And how long have you worked for the Sheriff's

27   Department?

28        A.   Approximately five years.

6

1        Q.    Were you working on June 21st, 2006 at approximately

2    4:48 a.m.?

3        A.    Yes.

4        Q.    Where were you working?

5        A.    I was working in the City of San Ramon.

6        Q.    Is that in Contra Costa County?

7        A.    Yes.

8        Q.    And on that date at that time, did you come into

9    contact with anyone you see in court today?

10       A.    Yes.

11       Q.    Can you point to that individual and identify them

12   by an article of clothing they're wearing.

13       A.    The gentleman at the defense table wearing the gold

14   uniform, jail uniform.

15            MR. WASLEY:   May the record reflect that he's

16   properly identified the defendant?

17            THE COURT:   Yes.

18            MR. WASLEY:   Thank you, your Honor.

19       Q.    Okay.   I want to step back a little bit and talk

20   about how you came in contact with the defendant.   At -- on

21   that day at that time, what were you doing?

22       A.    I was assigned routine patrol duties in the City of

23   San Ramon.

24       Q.    And do you remember specifically the location in the

25   City of San Ramon where you were?

26       A.    I was near the 7-Eleven on Crow Canyon Road in San

27   Ramon.

28       Q.    And what, if anything, did you observe at that time?

7

1        A.    I observed a Honda Accord leaving the parking lot.

2        Q.    And what, if anything, did you notice about the

3   Honda Accord?

4        A.    As the vehicle left, I followed the vehicle and I

5   noticed that the rear license plate lamp was not illuminated.

6        Q.    Okay.  I want to talk about the scene as it was at

7   that time.

8        A.    Okay.

9        Q.    What -- was it light outside?

10       A.    It was dark.

11       Q.    Okay.  Approximately how far behind the vehicle were

12   you?

13              THE COURT:  Okay.  When?

14              MR. WASLEY:  When you first observed the license

15   plate.

16              THE COURT:  License plate or license?  Okay.  I

17   thought you were talking about some sort of bulb.

18              THE WITNESS:  The license plate lamp was not

19   illuminated, so I actually was speaking about a bulb.

20              THE COURT:  Okay.  How far away from him were you

21   when you noticed?

22              MR. WASLEY:  Thank you, your Honor.

23              THE WITNESS:  I was within 50 feet.

24   BY MR. WASLEY:

25       Q.    Okay.  And is it a violation to not have a light

26   bulb on a license plate?

27       A.    Yes, it is.

28       Q.    So after you noticed this missing --

8

1          THE COURT:  Hold it.  Could you tell me what the
2     Code Section is.
3          THE WITNESS:  I believe it's 24601.  I can refer to
4     my report to get the exact number if you'd like.
5          THE COURT:  Yeah, I'm going to have to look it up,
6     so, please.
7          THE WITNESS:  Yeah, that's 24601 of the Vehicle
8     Code.
9          THE COURT:  Go ahead.
10    BY MR. WASLEY:
11         Q.   So after you made this observation, Deputy, what did
12    you do next?
13         A.   I activated my overhead emergency lights, and I made
14    a traffic stop.
15         Q.   And I want to walk you through what happened during
16    that traffic stop.  What -- can you just walk us through, what
17    did you do when you approached the vehicle?
18         A.   Well, the vehicle yielded.  I approached the vehicle
19    on the driver's side, and I made contact with the driver,
20    Mr. Smith.
21         Q.   Did you ask the defendant for identification?
22         A.   I did.
23         Q.   Did he provide you with any identification?
24         A.   Yes.
25         Q.   What, if any, observations did you make of the
26    defendant when you contacted him?
27         A.   It appeared he wasn't looking at me when he spoke as
28    if he may have been nervous.

9

1    Q.    And --

2              MR. AHEARN:  Objection, calls for speculation.

3              THE COURT:  Well, since this is a 1538, I'm going to

4    allow that part to remain in right now.  Go ahead.

5    BY MR. WASLEY:

6    Q.    And during your initial conversation with the

7    defendant, did you ask if he was on probation or parole?

8    A.    Yes.

9    Q.    And what did the defendant say?

10   A.    The defendant told me he was on parole.

11   Q.    And after you learned that, what did you do next?

12   A.    I conducted a search of his person and the vehicle.

13   Q.    And specifically referring to the defendant's

14   person, what, if anything, did you find on him?

15   A.    I found a, what we call a ninja rock, a piece of

16   porcelain from a spark plug with a ribbon tied around it.

17             THE COURT:  Okay.  Now, my question, Mr. Ahearn, is

18   this an issue about detention only?

19             MR. AHEARN:  I believe once there's a parole issue

20   that it's probably all moot from this point.

21             THE COURT:  Okay.  So I think that's all he wants to

22   talk about.  Did you want to ask anything else?

23             MR. WASLEY:  I don't believe so.  I think we're

24   good, your Honor.  Thank you.

25             THE COURT:  Okay.  Cross-examination.

26                        CROSS-EXAMINATION

27   BY MR. AHEARN:

28   Q.    Now, Deputy, I believe you testified that on

1  June 24th of last -- June 21st of last year, you were parked

2  somewhere near the 7-Eleven when you saw this Honda Accord

3  leaving; is that correct?

4      A.   That's correct.

5      Q.   And your testimony is that today, that you noticed

6  that the license plate lamp was not working?

7      A.   That's correct.

8      Q.   And do you recall testifying at a preliminary

9  hearing in this matter?

10      A.   Yes.

11      Q.   Do you recall testifying to the same thing that the

12  license plate lamp was not working on the car that you pulled

13  over?

14      A.   Yes.

15      Q.   However, though, wasn't that license plate lamp

16  working?

17      A.   I'm sorry?

18      Q.   Wasn't that license plate lamp working?

19      A.   No.  I don't believe it was.

20      Q.   You don't believe it was?

21      A.   It was not illuminated.

22      Q.   Now, you wrote a report about this incident as well;

23  is that correct?

24      A.   Yes.

25      Q.   In that report, you also wrote that the license

26  plate lamp was not illuminated?

27      A.   Yes.

28      Q.   Well, isn't that false?  In fact, the license plate

11

1    lamp was working?

2        A.    No.    The license plate lamp was not illuminated.

3        Q.    Officer, don't you have a history in this county of

4    fabricating probable cause in arrests?

5            MR. WASLEY:    Objection, relevance.

6            THE COURT:    Well, it's relevant, but it's a vague

7    question regarding history.    You'll have to be more specific.

8    BY MR. AHEARN:

9        Q.    Well, do you recall an incident where you arrested a

10   man by the name of an Abhinav Bhatnagar?    And the first name

11   is spelled A-B-H-I-N-A-V, last name is Bhatnagar,

12   B-H-A-T-N-A-G-A-R.

13           THE COURT:    How long ago?

14           MR. AHEARN:    In May, on May 20th, 2006.

15           MR. WASLEY:    Your Honor, again, I'm going to object

16   to relevance and ask for an offer of proof of where this is

17   going.

18           THE COURT:    Okay.    Are you going to give an offer of

19   proof?

20           MR. AHEARN:    I would be happy to outside the

21   officer's presence, your Honor.

22           THE COURT:    Okay.    Officer, if you wouldn't mind

23   stepping out of the courtroom for just a minute.

24           THE WITNESS:    Okay.

25           (The witness exits the courtroom.)

26           THE COURT:    Okay.    The officer has left.    Go ahead,

27   Mr. Ahearn.

28           MR. AHEARN:    Your Honor, my offer of proof is that

1  Mr. -- or Officer Ingrassia testified at a 1538.5 hearing in
2  November of last year and before Judge Treat where he
3  testified about a stop he made of Mr. Bhatnagar at a gas
4  station.  He testified at that hearing that he followed
5  Mr. Bhatnagar's car, saw him make an illegal U-turn, and then
6  arrested him for DUI at the Valero gas station on Market Place
7  in San Ramon.

8          However, the motion was granted.  The motion to
9  suppress was granted in part based on the testimony of
10 Mr. Bhatnagar who said he was at the station, that the cop
11 never followed him, and that he -- there was no -- the officer
12 arrived at the gas station two to three minutes after he had
13 actually pulled in there.  There was other witnesses there who
14 saw the officer do that as well.  So...

15          THE COURT:  So, in other words, no illegal U-turn?
16          MR. AHEARN:  There was no illegal U-turn, correct.
17          THE COURT:  Okay.  And then so the motion to
18 suppress was granted --
19          MR. AHEARN:  It was granted.
20          THE COURT:  -- based on credibility?
21          MR. AHEARN:  Yes.  There was -- at that hearing,
22 there was a -- the person who was at the gas station testified
23 and there was another issue that came up about the officer
24 telling Mr. Bhatnagar -- basically calling him a terrorist.
25 There was a couple allegations that Mr. Bhatnagar testified to
26 that, "stop crying.  It's only a misdemeanor.  Even if you
27 look like a terrorist, I'm not charging you for that."  And a
28 couple different things like that.  That phone conversation was

13

1   overheard.  He was on the phone when a couple of those

2   comments were made, and there was another witness who

3   testified at that 1538 about hearing those.

4          THE COURT:  Okay.  So that's the offer of proof.  It

5   relates to the credibility of the officer.  And I assume in

6   the hallway is Mr. Bhatnagar?

7          MR. AHEARN:  I assume he is, yes.

8          THE COURT:  Yes.  And therefore, he has a good faith

9   basis for asking the question, and he has a witness who's

10  going to say this putting the credibility of the officer at

11  issue.

12         MR. WASLEY:  May I be heard briefly, your Honor?

13         THE COURT:  On?

14         MR. WASLEY:  On this issue.  Very briefly.

15         The issue that he's speaking, that counsel is

16  talking about, the 1538 suppression motion, Mr. Bhatnagar, the

17  credibility issue hinged on the allegation of whether the

18  Deputy made racist threats or whether he was racist in that.

19         THE COURT:  Okay.  Now, listen, what Mr. Ahearn is

20  saying is that he is putting the officer's credibility at

21  issue.  Okay.  So it could be that Judge Treat found no

22  illegal U-turn, or Judge Treat could have found that the

23  officer denied using the phrase "terrorist," and the witness

24  said he did.

25         In any event, credibility does become an issue, so

26  if you were objecting to me even hearing it, I have to

27  overrule that.  Okay.

28         If you could get the officer.  I'm sorry, yeah, go

14

```
 1   ahead.

 2            MR. AHEARN:  And, your Honor, just to speed things

 3   up, if you can hold on one second.

 4            THE COURT:  Oh.

 5            MR. AHEARN:  I'm going to ask him about another

 6   incident involving a man by the name of Raymond Eli, a similar

 7   incident that happened on --

 8            THE COURT:  Is that witness here?

 9            MR. AHEARN:  He is here.

10            THE COURT:  Okay.  That happened September 15th of

11   last year where the officer claimed that the man made an

12   illegal turn where the man said he did not make that illegal

13   turn and testified to that.  And he testified about a couple

14   other things about what the officer said to him about lighting

15   up a cigar and speeding.

16            Okay.  Now, was that a trial or...

17            MR. AHEARN:  That was another 1538.5 motion.  Both

18   witnesses testified that Mr. Eli testified at that preliminary

19   hearing -- excuse me, at that motion to suppress that he

20   stopped at the sign and that he was not speeding and...

21            THE COURT:  What happened?

22            MR. AHEARN:  The motion was granted.

23            THE COURT:  It was granted.  Was it granted based on

24   credibility to your knowledge?

25            MR. AHEARN:  From what I can tell from the

26   transcript, yes, but the Court is not very specific.

27            THE COURT:  Okay.  Was it Judge Treat?

28            MR. AHEARN:  No, it was Judge Kolin.
```

1          THE COURT:  Kolin?

2          MR. AHEARN:  Yes.

3          THE COURT:  Okay.  So now we have two witnesses who

4  are going to pretty much attack the detention issue based on

5  credibility, and I would allow that, too.

6          MR. AHEARN:  And there's one other issue with the

7  officer, so we don't have him keep coming back, is that the

8  officer also stopped Mr. Bhatnagar in September, made a couple

9  of comments about "What are you doing in San Ramon?  I thought

10 you were supposed to leave."  Cited him for a violation.

11 Subsequently, that violation was found not true.

12         THE COURT:  You mean like a traffic ticket?

13         MR. AHEARN:  Yes, a traffic ticket.

14         THE COURT:  How do you -- found not true.  You mean

15 in front of a commissioner?

16         MR. AHEARN:  Yeah, in front of a commissioner.  It

17 was found not guilty.

18         THE COURT:  So it's the same man stopped by the same

19 officer a few months later?

20         MR. AHEARN:  Yes.

21         THE COURT:  Okay.  Did the officer testify?

22         MR. AHEARN:  I presume he did.  From what I can tell

23 from the printout of the court that I have taken out from Law

24 and Justice, he did testify.

25         THE COURT:  Okay.  Well, I guess we'll find out from

26 the officer whether or not he did.  And that was in September.

27 Okay.  Could one of you bring the officer back in?

28         Now, you know that this information comes from a

16

1   Pitchess motion, and it is not discoverable really prior to

2   now.

3            MR. WASLEY:  I understand.

4            THE COURT:  Okay.

5            MR. AHEARN:  Well, Judge, that's not entirely true;

6   it's inside and outside so...

7            THE COURT:  What's inside and outside?

8            MR. AHEARN:  I can explain to you later.

9            THE COURT:  Okay.  I was just -- he's a law clerk,

10  so I just wanted him to know where this was coming from.

11           MR. WASLEY:  And I appreciate it.

12           THE COURT:  I just assume Mr. McConkie has explained

13  it to him.

14           MR. WASLEY:  He briefed me.  Thank you, your Honor.

15           THE COURT:  Okay.  Go ahead.

16                    CROSS-EXAMINATION (Continued)

17  BY MR. AHEARN:

18       Q.   Now, Officer, I was asking you about the arrest you

19  made of Mr. Bhatnagar back in May of last year.  Do you recall

20  that arrest?

21       A.   Yes.

22       Q.   Do you recall writing a report about that incident?

23       A.   Yes.

24       Q.   Do you recall in that report that you wrote that

25  Mr. Bhatnagar was -- you saw Mr. Bhatnagar driving westbound

26  on Bollinger Canyon Road near Market Place?

27       A.   Yes.

28       Q.   Do you recall writing in that report that you saw

17

1   Mr. Bhatnagar make an illegal U-turn at Bishop Ranch East?

2        A.    Bishop Ranch One East, yes.

3        Q.    Do you also recall that you saw Mr. Bhatnagar make a

4   right turn onto Market Place?

5        A.    Yes.

6        Q.    Do you also recall writing in your report that

7   Mr. Bhatnagar's car made an abrupt right turn into the Valero

8   gas station?

9        A.    Yes.

10       Q.    And based on that, you had to avoid a collision.  Do

11  you recall writing that as well?

12       A.    Yes.

13       Q.    And do you recall that you wrote in your report that

14  the car pulled up next to a gas pump and that's when you put

15  on your overhead lights; do you recall that?

16       A.    Yes.

17       Q.    At that point, you contacted Mr. Bhatnagar in the

18  car; do you recall --

19       A.    Yes.

20       Q.    -- writing that in your report?

21       A.    Yes.

22       Q.    Do you recall also testifying at a motion to

23  suppress in November -- on November 27th last year in front of

24  Judge Treat in Walnut Creek court?

25       A.    Yes.

26       Q.    Do you recall testifying to almost the same facts

27  you wrote in your police report?

28       A.    Yes.

1    Q.   Do you recall you additionally stated at the motion

2    to suppress that when Mr. Bhatnagar's car made a right turn

3    onto the Valero gas station, he crossed over two lanes of

4    traffic going from the left lane to the right lane.  Do you

5    recall that testimony?

6    A.   No, I don't know.  I don't recall that.

7    Q.   Would anything help refresh your recollection?

8    A.   Would it help refresh --

9    Q.   As far as refresh your recollection if you testified

10   at that preliminary hearing -- excuse me, at that motion to

11   suppress that you saw the car make a right-hand turn from the

12   left lane all the way cutting across the right lane.

13   A.   From the left lane cutting across the right lane?

14   Q.   And going right into the Valero station.

15   A.   Yes.  I remember that now, but you --

16   Q.   You remember testifying to that?

17   A.   I thought you had just asked me if I saw him cut

18   across two lanes.

19        THE COURT:  Actually, you did say that, Mr. Ahearn.

20        THE WITNESS:  Which that -- I don't know if -- if

21   that -- if I testified to that, if I did, that's incorrect,

22   because I believe there's only two lanes.  So he cut across

23   one.

24   BY MR. AHEARN:

25   Q.   So you recall testifying to that?

26   A.   I recall it happening.

27   Q.   So your testimony here today is that that actually

28   happened as well as what you described in your report and what

19

1   you testified at the preliminary hearing?

2       A.   Yes.

3       Q.   So you deny that you -- when you got to the gas

4   station, Mr. Bhatnagar was already there?

5       A.   I deny that?

6       Q.   You didn't see him make an illegal U-turn; you saw

7   him parked at the gas pump?

8       A.   No, that is not correct.

9       Q.   You deny that you first went up and talked to a

10  woman who appeared to be drunk talking to Mr. Bhatnagar?

11      A.   No.   I did not first contact the woman, no.

12      Q.   Didn't you ask Mr. Bhatnagar if he came from a bar

13  across the street?

14      A.   I don't recall if I asked him that or not.

15      Q.   Didn't you tell Mr. Bhatnagar after you arrested him

16  and took him down to the station to "Stop crying.  It's only a

17  misdemeanor.  Even though you look like a terrorist, I'm not

18  charging you with that."

19           Do you recall telling him that?

20      A.   No.   I didn't tell him that.

21      Q.   Did you tell Mr. Bhatnagar, "Boy, take it easy.  You

22  Asians create a lot of trouble everywhere in the world and

23  steal jobs here"?

24      A.   No.   I did not tell him that.

25      Q.   Did you tell him at some point, "We are leaving now.

26  Got to get you going, terrorist"?

27      A.   No.   I didn't tell him that.

28      Q.   Do you recall testifying at a DMV hearing?

1    A.   Ever?

2    Q.   Yes, in this -- in relation to Mr. Bhatnagar's case.

3    A.   Yes.

4    Q.   Do you recall at that 1538 hearing that you had in

5 Mr. Bhatnagar's case that that tape was replayed to you?

6    A.   Yes.

7    Q.   Do you recall listening to that tape to admitting

8 that you did make some racial comments towards Mr. Bhatnagar?

9    A.   No.

10    Q.   So you didn't make any -- your testimony is you

11 didn't make any racial statements toward Mr. Bhatnagar?

12    A.   I did not make any -- my testimony is I did not make

13 any racial statements towards Mr. Bhatnagar.

14    Q.   Did you make any statements about Mr.

15 Bhatnagar being a terrorist?

16    A.   No.

17    Q.   Do you recall pulling Mr. Bhatnagar over again on

18 September 29th of this last year in San Ramon?

19    A.   Yes.

20    Q.   Do you recall pulling him over at Market Place and

21 Montgomery?

22    A.   It's not where I pulled him over.

23    Q.   Where did you pull him over?

24    A.   Camino Ramon and Bollinger.

25    Q.   And do you recall that you cited him for failure to

26 obey a sign?

27    A.   Yes.

28    Q.   Do you recall telling Mr. Bhatnagar when you pulled

21

1    him over on September 29th, "What are you doing in San Ramon?

2    I don't want to see you in San Ramon.  I'll break your bones,

3    and no lawyer can do anything to me.  I can take you to jail

4    right now."

5              Do you recall saying that to Mr. Bhatnagar?

6       A.    I didn't say that to him.

7       Q.    Do you recall also telling Mr. Bhatnagar, "I don't

8    want to see you in San Ramon"?

9       A.    I did not tell him -- I did not say that to him.

10      Q.    Since you arrested Mr. Bhatnagar in June of last

11   year, have you made any threatening phone calls to his house?

12      A.    No.

13      Q.    Have you had anyone or asked anyone to make any

14   threatening phone calls to his house?

15      A.    No.

16      Q.    Do you recall arresting a Raymond Eli --

17      A.    Yes.

18      Q.    -- on September 15th of last year?

19      A.    Yes.

20      Q.    That was about 1:20 in the morning; is that correct?

21      A.    That sounds about right.

22      Q.    And do you recall that you saw Mr. -- you pulled

23   Mr. Eli over on Bollinger Canyon Road; is that -- do you

24   recall that?

25      A.    No.  I did not pull him over on Bollinger Canyon

26   Road.

27      Q.    Where did you pull him over?

28      A.    On Crow Canyon Road.

1        Q.   Did you stop him at Crow Canyon Road at Bollinger
2    Canyon Road, that intersection?
3        A.   It was on Crow Canyon Road.  It was just east of
4    Bollinger Canyon Road, yes.
5        Q.   Now, do you remember testifying at a preliminary
6    hearing -- excuse me, testifying at a suppression motion in
7    that matter?
8        A.   Yes.
9        Q.   That you -- okay.  And do you recall testifying that
10   you saw Mr. Eli's car make a right turn onto Crow Canyon Road
11   without stopping at the stoplight?
12       A.   Yes.
13       Q.   And you saw him make that illegal turn onto Crow
14   Canyon Road from San Ramon Valley Road; is that correct?
15       A.   Yes.
16       Q.   And then you testified that you didn't stop Mr. Eli
17   for about a mile; is that correct?
18       A.   Yes.
19       Q.   And when you saw Mr. Eli make this -- you testified
20   that when you saw Mr. Eli make this illegal turn onto San
21   Ramon -- onto Crow Canyon Road, you were near the intersection
22   of San Ramon Valley Boulevard; is that correct, you were
23   driving westbound on Crow Canyon Road?
24       A.   It was -- I didn't pull him over for making an
25   illegal turn.
26       Q.   You didn't?
27       A.   It was failing to stop at the stop sign -- at the
28   stoplight, excuse me.

1           I forgot the rest of the question, though.

2      Q.    You were traveling westbound on Crow Canyon Road

3    when you saw Mr. Eli make that turn failing to stop at the

4    stop sign?

5      A.    Stoplight.

6      Q.    Stoplight.    That's correct?

7      A.    Stoplight.

8      Q.    And that's what you testified to?

9      A.    Yes.

10      Q.    At that motion to suppress back in February of this

11    year?

12      A.    Yes.

13      Q.    Did you write a report about the incident?

14      A.    Yes.

15      Q.    Did you write that in your report as well?

16           THE COURT:   Write what?

17    BY MR. AHEARN:

18      Q.    Well, did you write that you saw Mr. Eli fail to

19    stop at a stoplight when he turned onto Crow Canyon Road?

20      A.    I don't have my report to see if I wrote that.

21    That's how I recall the incident, however.

22      Q.    And that's how you recall testifying at the motion

23    to suppress?

24           Isn't it true that you --

25           THE COURT:   Wait.  Do you want him to answer that?

26           MR. AHEARN:  I thought he said, "yes".

27           THE COURT:  He didn't say --

28           THE WITNESS:  I don't -- that's how I remember the

1    incident.  I don't specifically remember testifying.  I don't.

2                THE COURT:  Okay.

3                THE WITNESS:  That's the answer.

4                THE COURT:  Okay.  Fine.  Next question.

5    BY MR. AHEARN:

6        Q.    Isn't it true, though, that you didn't stop Mr. Eli

7    for failing to stop at the stoplight, that you first

8    approached him and asked him if he was speeding?

9        A.    I don't recall.

10       Q.    Do you recall that you were asking Mr. Eli what he

11   lit as you were driving behind him?

12       A.    I don't recall.

13       Q.    Do you recall if Mr. Eli told you he lit a cigar?

14       A.    I remember something about a fruit-flavored cigar.

15       Q.    But you did follow Mr. Eli for about a mile before

16   you pulled him over; is that correct?

17       A.    Yes.

18       Q.    Now, when you pulled over Mr. Smith on June 21st of

19   last year --

20                THE COURT:  Mr. Smith?

21                MR. AHEARN:  Yes.  Mr. Bhatnagar was May.

22                THE COURT:  And then Raymond Eli.  Oh, and now this

23   Mr. Smith?

24                MR. AHEARN:  Yes.

25                THE COURT:  Thank you.

26   BY MR. AHEARN:

27       Q.    When you pulled over Mr. Richard Smith, when you

28   approached the car, you asked him if they were smoking

1  marijuana?

2       A.    I don't recall.

3       Q.    You don't recall asking him that?

4       A.    I don't recall asking that.

5             MR. AHEARN:  I have nothing further.

6             THE COURT:  Okay.  Any redirect?

7             MR. WASLEY:  Yes, your Honor.

8                     REDIRECT EXAMINATION

9  BY MR. WASLEY:

10      Q.    Deputy, you mentioned you worked as a deputy in some

11  capacity for the Contra Costa Sheriff's Department for five

12  years; is that right?

13      A.    Yes.

14      Q.    How many traffic enforcement stops have you made

15  over that five-year period?

16      A.    Well over 100.  I couldn't even guess.

17      Q.    And how many suppression motions have you testified

18  in?

19            MR. AHEARN:  Objection, relevance at this point.

20            THE COURT:  Overruled.

21            THE WITNESS:  I think this would be my third.

22  BY MR. WASLEY:

23      Q.    Okay.  And I want to talk specifically about the

24  incident with Mr. -- I'm probably going to butcher the last

25  name -- Bhatnagar.  That occurred in May of 2006; is that

26  right?

27      A.    Yes.

28      Q.    And before you came here today, did you review that

26

1   report that you made in that?

2        A.    No.

3        Q.    Did you review the suppression motion transcript

4   before you came in here today?

5        A.    No.

6        Q.    Was there an internal investigation with respect to

7   that incident involving Mr. Bhatnagar?

8        A.    Yes.

9        Q.    And what was the result of that?

10            MR. AHEARN:   Your Honor, I would object to hearsay

11   and foundation.

12            THE COURT:   Well, the foundation I'm assuming he

13   would know.

14            MR. AHEARN:   And the relevance as well.

15            THE COURT:   Okay.  Now, when was that investigation

16   done?

17            THE WITNESS:   It was completed probably four or five

18   months ago.

19            THE COURT:   Okay.  My question, I guess, is was it

20   before or after the motion to suppress?

21            THE WITNESS:   It was after.

22            THE COURT:   Okay.  Then overruled.  You may answer.

23            MR. AHEARN:   Well, your Honor, I just would like to

24   know what the relevance to this proceeding is of what the

25   internal investigation found.  We don't really know what the

26   method of investigation was.  We don't know --

27            THE COURT:   And I don't know the thinking of the

28   judge.

1          MR. AHEARN:   -- who was spoken to, and so I would

2    object.   I don't think there's sufficient foundation or

3    relevance, in fact, to this proceeding.

4          THE COURT:   Yeah.   But I let you tell me that it was

5    granted.   And so because I know that, and this investigation

6    was done after, or at least not completed until after that

7    ruling, wouldn't it be helpful to know if they included that

8    motion that the PD's office had?

9          MR. AHEARN:   There's a lot of things that could be

10   helpful at times.   The question is whether it's admissible and

11   whether it's relevant and whether there's proper foundation

12   for this witness to be brought in.   So I would say that based

13   on this witness's testimony, based on this hearing --

14          THE COURT:   Okay.

15          MR. AHEARN:   -- I don't think there's sufficient

16   relevance or foundation for this testimony to be brought in.

17          THE COURT:   Okay.   There is a good argument for

18   that.   But then I should also state then any ruling a previous

19   judge made in that incident, I won't consider either.   And I

20   shouldn't.   I should just look at it, listen to the testimony

21   of both witnesses and decide for myself without regard to what

22   IA did or any other judge.   Okay?

23          MR. AHEARN:   That's fine.

24          THE COURT:   Okay.

25          MR. WASLEY:   Okay.

26          THE COURT:   So then the objection is sustained.

27   BY MR. WASLEY:

28      Q.   I want to talk briefly about the -- you were asked

1    about the traffic incident involving Raymond Eli.

2        A.    Yes.

3        Q.    And that was on December 15th, 2006; is that right,

4    somewhere right around there?

5        A.    Yeah, I don't know the dates.

6              THE COURT:  Actually, Mr. Ahearn said September.

7              MR. WASLEY:  Oh, September 15th.  Sorry.  Thank you,

8    your Honor.

9        Q.    Did you review a report of that incident before you

10   came to court today?

11       A.    No.

12       Q.    Did you review a copy of the motion to suppress

13   hearing?

14       A.    No.

15             MR. WASLEY:  No further questions, your Honor.

16             THE COURT:  Okay.  Anything else, Mr. Ahearn?

17                    RECROSS-EXAMINATION

18   BY MR. AHEARN:

19       Q.    Deputy, the District Attorney just asked you if

20   you've worked in the Sheriff's Department for five years; is

21   that correct?

22       A.    Yes.

23       Q.    You're currently -- now, you testified additionally

24   that you're now working in the jail; is that correct?

25       A.    Yes.

26       Q.    Is there any reason why you're not on patrol

27   anymore?

28       A.    I voluntarily came back to the jail.

1          MR. AHEARN:   Thank you.   I have nothing further.

2          THE COURT:   Anything else?

3          MR. WASLEY:   Nothing further, your Honor.

4          THE COURT:   Excused or subject to recall?

5          MR. AHEARN:   Subject to recall.

6          THE COURT:   Okay.   If you could wait outside,

7    Officer.

8          Do the People have any further witnesses or

9    evidence?

10          MR. WASLEY:   We do not, your Honor.

11          THE COURT:   Okay.   Does the defense?

12          MR. AHEARN:   No.

13          THE COURT:   You have no witnesses?

14          MR. AHEARN:   Oh, I'm sorry, we do.   I'm sorry.   I

15    was caught in thought.   I'll be right back, your Honor.

16          THE COURT:   All right.

17          MR. AHEARN:   Your Honor, at this point, the defense

18    would call Mr. Bhatnagar to the stand.

19          THE COURT:   Okay.   Sir, you want to come right up

20    here.

21          MS. HUANG:   Good afternoon, your Honor.   I just

22    wanted to assert I'm the attorney for Mr. Bhatnagar.

23          THE COURT:   Okay.   Hang on, ma'am.

24          MS. HUANG:   Okay.

25          THE COURT:   Come up here, please, and just stand

26    right here.

27          THE WITNESS:   Thank you.

28          THE COURT:   And your name, ma'am?

1          MS. HUANG:  I'm Jenny Huang.  I'm with Justice

2    First, and I'm the attorney for Mr. Bhatnagar in a federal

3    civil suit against Officer Ingrassia.  And I just wanted to

4    assert that the -- Mr. Bhatnagar does not wish to testify

5    because of his pending litigation and because of his fear of

6    retaliation by this officer.  There's been a lot of threats, a

7    lot of intimidation by this officer, and he's really concerned

8    about testifying in this case.

9          And our position is that the substance of his

10   testimony can be obtained by the transcript as well as the

11   Minute Order, which we brought documentation of that.  If the

12   Court would take judicial notice of those things.

13         THE COURT:  Well, frankly, he has no right to

14   refuse.

15         MS. HUANG:  So we're asking whether the Court would

16   consider taking judicial notice of both the Minute Order as

17   well as the transcript from his criminal case.

18         THE COURT:  I cannot, ma'am, because it is the

19   prosecution who gets to cross-examine.

20         MS. HUANG:  Okay.

21         THE COURT:  But you're welcome to stay.

22         MS. HUANG:  All right.

23         THE COURT:  Thank you.

24         MS. HUANG:  Thank you.

25         THE COURT:  Please raise your right hand.

26                        **ABHINAV BHATNAGAR**

27              *called as a witness, having been duly*

28              *sworn, testified as follows:*

31

1           THE CLERK:  Thank you.  Please be seated.

2           Please state your name for the record, spelling both

3    your first and last name.

4           THE WITNESS:  My fist name is Abhinav,

5    A-B-H-I-N-A-V. My last name is Bhatnagar, B-H-A-T-N-A-G-A-R.

6           THE COURT:  Bhatnagar?

7           THE WITNESS:  Yes, ma'am.

8           THE COURT:  Okay.  You may proceed.

9                      DIRECT EXAMINATION

10   BY MR. AHEARN:

11      Q.   It's Bhatnagar (pronouncing)?

12      A.   Yes.

13      Q.   I'm sorry.

14      A.   Abi is fine if you cannot --

15      Q.   Mr. Bhatnagar, I think you just heard your attorney

16   say that you don't want to be here; is that correct?

17      A.   Yes.

18      Q.   Why are you here today?  Did you receive a subpoena?

19      A.   Yes.

20      Q.   Okay.  Why is it that you don't want to be here?

21      A.   Just -- I'm just -- you know, my family is scared

22   and concerned for their safety.

23      Q.   Why is that?

24      A.   Just what I went through.

25      Q.   Okay.  And what is that that you went through?

26      A.   I was just being harassed, you know.

27           THE COURT:  Talk into the microphone.

28           THE WITNESS:  Yes, I'm sorry.

1          THE COURT:  And you need to explain specifically

2    what you're talking about.

3    BY MR. AHEARN:

4          Q.   How were you harassed?

5          A.   I was pulled over.  He claimed that he pulled me

6    over twice in which I -- first time I was just getting gas,

7    and second time, I never even broke any laws.  It's the same

8    implication he pulled me --

9          Q.   Other than the two incidents, have there been any

10   other harassment?

11         A.   I've just got some phone calls, general.

12         Q.   When did you get these phone calls?

13         A.   Just being a while, and I'm not getting anymore, but

14   it was last year more.

15         Q.   Was it after the two incidents that you were

16   arrested?

17         A.   Yes.

18         Q.   Or cited, I guess I should say, and arrested on one?

19         A.   Yes.

20         Q.   Was it also after a DMV hearing as well?

21         A.   It started after the DMV hearing.

22         Q.   What did the phone calls say, if you can recall?

23         A.   I'm not sure.

24         MR. WASLEY:  Objection, hearsay.

25         THE COURT:  No, no.  I just wanted some foundation.

26   Where do you think they came from?

27         MR. AHEARN:  Well, your Honor, I don't necessarily

28   know if it's -- I'm not really asserting it for the truth of

1    the matter.   It's just to give the tenor of the witness's

2    testimony.

3              THE COURT:  Oh, for state of mind today?

4              MR. AHEARN:   State of mind today, and so I don't

5    think I can actually offer it for the truth of where the

6    foundation where he got it from, but that's why I'm offering

7    it.

8              THE COURT:  Okay.  What were they about?

9              THE WITNESS:  Just, you know, not -- you know, just

10   be careful, and we'll get you and, you know, get your family.

11   That's it right now.

12   BY MR. AHEARN:

13       Q.    You were scared because of that to come to court

14   today?

15       A.    Yes, my parents were scared.  They're concerned for

16   my safety.  Everybody -- I'm just -- because I'm living with

17   my parents and my younger brother, so it's not only me; it's

18   the whole family.

19       Q.    Is there anything other than phone calls?

20       A.    No, just those two incidents.

21       Q.    Now, let's go to the first incident when you were

22   arrested in May of -- May 20th, 2006.  I think you said you

23   were at a gas station?

24       A.    Yes.

25       Q.    What happened while you were at the gas station?

26       A.    I was at the gas station trying to get gas.  And

27   first I was going to pay, use my credit card, but I had cash.

28   And I started walking towards the gas attendant, and there was

```
 1    a Caucasian girl who asked me for some money for cigarettes,
 2    and she looked very, you know, drunk, and I politely refused
 3    her that I could not give her money.
 4         Q.    Where did that happen?  Where did you talk to this
 5    woman?
 6         A.    It was in San Ramon.
 7         Q.    Where in the gas station, though, was it?
 8         A.    It's on Market Street.
 9         Q.    Okay.  And what was the name of that gas station?
10         A.    Valero gas station.
11         Q.    Had you been to that gas station before?
12         A.    Yeah, I'd been to that gas station in the daytime
13    too, like three, four times earlier.
14         Q.    How long were you talking to the woman for?
15         A.    It was at least a minute or two.
16         Q.    And how long were you at the gas station before you
17    began speaking with the woman?
18         A.    I'm sorry, can you repeat the question?
19         Q.    How long were you at the gas station before you
20    began speaking to the woman?
21         A.    I just got out of the car and she was already there.
22    So it wasn't that long.
23         Q.    What happened after you talked to the woman?
24         A.    She was just kind of, you know, trying to persuade
25    me to give her money and just, you know, she looked drunk and
26    she was trying to, you know, persuade me to give her money,
27    and I was -- again, I politely refused her three, four times
28    that I can't give her money because I don't have any money.  I
```

1    need money for gas.  Just when someone is drunk, you don't

2    want to talk to them much.

3         Q.   How did that conversation end?  Did you just move a

4    long or...

5         A.   Yeah, I was just walking towards the gas attendant,

6    and then just like a couple minutes later, a police car, right

7    across my car, two police officers were there.

8         Q.   Okay.

9              THE COURT:  They drove up or they were just there?

10             THE WITNESS:  There was one car, which came across

11   the car, and there was -- I believe one car was already

12   earlier there, but I'm not sure about it.  It was parked

13   somewhere in the gas station, but I'm not sure about that.  It

14   was somewhere around the other side.

15   BY MR. AHEARN:

16        Q.   What happened when the officers arrived?

17        A.   It's -- it was -- I believe it was Friday, a

18   weekend, you know, Friday, Saturday evening.  I don't remember

19   what day what he said that was.  Friday night or Saturday

20   early morning you find a lot of drunk drivers here.  There's,

21   you know, a bar right across the gas station.  And I wear

22   contact lenses, my glasses.  You know, sometimes I wear

23   glasses, so my eyes were like, my lenses were bothering me, so

24   he was just asking me, like, "Did you went to that bar?"  I

25   says, "no," you know, and he asks me questions later.

26        Q.   Do you recall what the name of the officer was who

27   approached you at that point?

28        A.   No.  I never had seen him before in my life.  That

1    was the first time.

2    Q.    Do you know his name today?

3    A.    Yes.

4    Q.    What's that officer's name?

5    A.    Officer Ingrassia.

6    Q.    Is his first name Jason?

7    A.    Yes.

8    Q.    Have you seen him at other prior hearings that

9    you've testified in, a DMV hearing or prior suppression

10   motions that you did?

11   A.    Yes.

12   Q.    And where were you talking to the officer, inside

13   your car or outside your car?

14   A.    I was outside the car.

15   Q.    And how long had you been at the station when you

16   were finally talked to by Deputy Ingrassia?

17   A.    I would say if you're just looking time-wise, I

18   would say at least two minutes, two to three minutes.

19   Q.    Prior to going to the gas station, had you made any

20   illegal U-turns on Bollinger Canyon Road?

21        MR. WASLEY:   Objection, calls for a legal

22   conclusion.  He's a lay witness.

23        THE COURT:  Did you make any U-turns?

24        THE WITNESS:  No, I never.  I didn't have to.  I had

25   to turn left to get to the gas station, the direction from

26   which I was coming from.

27   Q.    How did you get to the gas station?

28   A.    I was coming on Bollinger and turned left on Market,

37

1    so the gas station was already there.  So I didn't have to

2    make a U-turn anyways.

3        Q.    Now, Deputy Ingrassia subsequently arrested you; is

4    that correct?

5        A.    Yes.

6        Q.    Were you taken to the police station in San Ramon?

7        A.    Yes.

8        Q.    Once at the police station, and even prior to the

9    police station, did Deputy Ingrassia make any statements about

10   being a terrorist?

11       A.    You mean --

12       Q.    About you being a terrorist?

13       A.    While driving to the police station?

14       Q.    Yes.

15       A.    No, at the police station.

16       Q.    What did he say to you at the police station?

17       A.    I had never been arrested in my life, and I was

18   just, you know, in tears because one of my family member, too,

19   was kind of very bad stationed in India, and he was just

20   crying that "You're a man.  Don't be like this.  It's just a

21   misdemeanor.  I'm not charging you for any terrorist crime,

22   even though you look like a terrorist, you know."  And, you

23   know...

24       Q.    Did he say anything else about taking jobs or

25   stealing jobs?

26       A.    Yes.  You know, he said, "You Asians come and steal

27   jobs here."  I just politely told him that this is, you know,

28   my motherland, you know.  When the situation comes, I can just

1    do whatever it takes to serve this country.

2         Q.   Did he ever say something like, "We're leaving now.

3    Get going, terrorist"?

4         A.   Yeah, at the last stage.  I mean, I was talking to,

5    you know, one of my friends, and it happened, kind of shrugged

6    me to get going.

7              THE COURT:  "I was talking to one of my friends,"

8    and...

9              THE WITNESS:  Yeah, over the cell phone, and then he

10   just kind of, you know, shrugged and just, "Get going,

11   terrorist."

12             THE COURT:  The officer shrugged?

13             THE WITNESS:  Yeah, just kind of a little bit, "Get

14   going," because my hands were handcuffed.

15             THE COURT:  And he said, "Get going, terrorist"?

16             THE WITNESS:  Yes.  Yes, ma'am.

17   BY MR. AHEARN:

18        Q.   Mr. Bhatnagar, we actually have never met; is that

19   correct?

20        A.   No.

21        Q.   We just met outside the courtroom just here a minute

22   ago?

23        A.   Just five minutes ago.

24        Q.   Now, do you recall receiving a ticket from Deputy

25   Ingrassia sometime in September?

26        A.   Yes.

27        Q.   Of last year?

28        A.   Yes.

1      Q.    Do you recall what happened at that point?

2      A.    I was -- I had gone to the same gas station because

3   I was told by this -- I don't know if he's a detective like to

4   give, to ask this gas station's driver license and information

5   regarding to attending court.  So I went to the gas station --

6      Q.    Is that Mr. Ha?

7      A.    Mr. Ha.  And it was from the PD's Department that

8   send me the fax, you know.  And then I just wanted to get his

9   driver's license and address.  And then after talking to him,

10  I left the same gas station.  And trying to get back to the

11  freeway, and he pulled me again, and, again, gave me the

12  ticket for, same area, like U-turn, illegal U-turn.

13     Q.    Had you done anything illegal?

14     A.    No.  No.

15     Q.    From what you could tell?

16     A.    After the experience, too, you know, why would I

17  lie.  Anyways, I have not done beer before, too.  Same

18  location he's giving me an illegal U-turn and saying, you

19  know, "No attorney can do anything to you.  I can take your

20  ass" -- excuse my language.  That's what he said.  "I can take

21  your ass to jail anytime."  And I knew like had I retaliated,

22  he would have physically, you know, but I was just trying to

23  be cooperative and diplomatic to get rid of him at that time.

24  It was nighttime, pretty late.

25     Q.    When he pulled you over for that second ticket?

26     A.    Yes, yes.  Because Mr. Ha works graveyard, so I had

27  to go pretty late time.  So I was pulled over on a very dark

28  street, and it was kind of dark and just me and him only.

40

1          THE COURT:  May I ask a question?  Was that after

2    the DMV hearing?

3          THE WITNESS:  Yes, ma'am.  It was after the DMV

4    hearing.

5          THE COURT:  Okay.

6          THE WITNESS:  And it was also after Ms. Diana

7    Garrido filed the complaint to the Sheriff's Department

8    regarding this officer in September.

9          THE COURT:  All right.

10         MR. AHEARN:  And, your Honor, I'm not -- I wouldn't

11   offer the fact that a complaint was made.

12         THE COURT:  No.  I just wanted to know if the

13   officer had known what his testimony was, and apparently, yes,

14   because he was past the DMV hearing.

15   BY MR. AHEARN:

16   Q.    Did you testify at the DMV hearing like you're doing

17   here today?

18   A.    Yes.  I did testify at the DMV hearing.

19   Q.    And you did the same.  And he was -- Detective

20   Ingrassia was there as well?

21   A.    Yeah, he was there.

22   Q.    So he heard what you had to say?

23   A.    Mr. Ingrassia was -- no.  He had left by the time,

24   but he was given the documents by my attorney.

25   Q.    Okay.  Now, when he pulled you over in September of

26   last year for the ticket, did he say anything about you being

27   in San Ramon?

28   A.    Yeah, "I don't want to see you in San Ramon.  Just

41

1    don't come back here."

2        Q.    When you pulled in -- let's go back to May 20th of

3    last year.  When you pulled into the gas station, did you see

4    any officers driving behind you?

5        A.    No.

6        Q.    And you were there for a couple of minutes before

7    any officers approached you; is that fair to say?

8        A.    Yes.

9            MR. AHEARN:  I have nothing further with this

10   witness.

11           THE COURT:  Cross-examination.

12           MR. WASLEY:  Yes, your Honor.

13                        CROSS-EXAMINATION

14   BY MR. WASLEY:

15       Q.    Mr. Bhatnagar (pronouncing), is it?

16       A.    Yes, sir.  How you doing?

17       Q.    I want to talk about the first incident, the arrest

18   between you and Deputy Ingrassia.

19       A.    Okay.

20       Q.    That was on May 20th, 2006; is that right?

21       A.    Yes.

22       Q.    What time of night was that?

23       A.    It was around 1:00 o'clock.  I don't know the exact

24   time, but I'm just, you know, guessing.

25       Q.    And that was at a Valero gas station; is that right?

26       A.    Yes, sir.  Yes.

27       Q.    What were you doing prior to arriving at the Valero

28   gas station?

1    A.    Prior I had gone for a dinner.

2    Q.    Where had you gone out to dinner?

3         MR. AHEARN:  Your Honor, I'm going to object to

4  relevance at this point.

5         THE COURT:  Overruled.

6         THE WITNESS:  It was -- I don't remember the

7  restaurant.  It was in Pleasanton.  I don't believe it was

8  close, in Pleasanton or Pleasant Hill somewhere.

9    Q.    You don't recall the name of the restaurant?

10   A.    It was Left Bank, I think, something like that.

11 Left.  I never been to the restaurant ever after that, and

12 that was my first time I went there.

13   Q.    And at that dinner, had you drank any alcohol?

14   A.    Yes.

15   Q.    How many alcoholic beverages did you drink at

16 that --

17   A.    I had a beer and a Margarita.  Just two drinks.

18   Q.    And prior to going out to dinner, had you consumed

19 any alcohol?

20   A.    I don't drink much anyways.  That was the only day

21 in the whole year I drank, two drinks the whole year.  And

22 after that, I never even drank a glass of champagne.

23   Q.    But you had drank one beer?

24   A.    Yeah, I'm honest.  Yes, I did.  I'm just not -- I

25 had two drinks.  I told the officer at the site, too, I had,

26 you know, two drinks.

27   Q.    So you don't normally drink; that's your testimony

28 today?

43

1      A.    Yes.   After this experience, too, you know, I don't
2  want to drink at all.
3      Q.    But prior to this incident, did you -- you drank
4  before?
5      A.    No.   I told you the whole year last year that was
6  the only day.
7      Q.    In 2006, May 20th?
8      A.    It was the only day I had two drinks.
9      Q.    And okay.   So it's safe to say that you'll feel the
10  effects of one beer and a Margarita if you hadn't drank
11  anything in the entire year up until that point; is that
12  right?
13      A.    I think I'm around five-ten height.   I'm not -- I'm
14  not saying I'm a big guy, but I think I had two drinks.   That
15  does not makes my senses...
16      Q.    What was that?
17      A.    Generally, I'm saying -- you know, I'm just saying,
18  like, I was studying for medicine in India.   I'm just saying
19  like two drinks usually you don't expect, and I was --
20           THE COURT:   He's just asking, did you feel it at
21  this time?
22           THE WITNESS:   Not at all.
23  BY MR. WASLEY:
24      Q.    You did not feel any effects?
25      A.    Not at all.
26      Q.    You mentioned you had bloodshot eyes, though; is
27  that correct?
28      A.    No, it was -- my lenses were bothering.   They were

44

1   just irritated, so they were slightly red because the contact

2   lenses.  It happens when you're wearing contact lenses after

3   like a few hours.  It can happen.  And my lenses were old,

4   too, so that's what was bothering them.

5       Q.    So you had old contact lenses in?

6       A.    Yes.

7       Q.    And that's why --

8       A.    I mean, they were just -- they were not like -- you

9   know, I was supposed to -- those disposable lenses, I'm

10  supposed to change every month.  It was almost getting there,

11  close to the month.

12      Q.    Right.  And prior to contacting Deputy Ingrassia,

13  you had a conversation with a female in that Valero gas

14  station; is that right?

15      A.    Yes.  I never had seen her before.

16      Q.    And she had been drinking; is that right?

17      A.    I had not seen, but she looked very drunk, the way

18  of her slurred speech and, you know --

19      Q.    Did she have bloodshot eyes?

20      A.    I just -- she looked -- the way she was talking was

21  very, you know, you can't make it out.

22      Q.    Isn't it true that even when you contacted -- I mean

23  when you made contact with Deputy Ingrassia, he ran you

24  through some field sobriety tests; is that right?

25      A.    Yes, he did.

26          MR. AHEARN:  Objection, misstates the testimony

27  about who made contact with who.

28          THE COURT:  Well, wait a minute.  What's the

45

1   relevance, because the point is actually the detention?

2          MR. WASLEY:  I'm just going to witness credibility.

3   He testified in detail as to specific accounts of that

4   evening, so this goes to the credibility of all events of that

5   evening, your Honor.

6          THE COURT:  I don't think so.  I think you

7   established he had two drinks and, yeah, he might have had red

8   eyes, and he might have even been falling down drunk.  But the

9   question is, did he make any illegal U-turn, and he said,

10  "no".

11         MR. WASLEY:  Okay.

12     Q.    You mentioned a minute ago on direct you've received

13  threatening phone calls?

14     A.    I did.

15     Q.    Do you recall the dates or about the dates of these

16  threatening phone calls?

17     A.    No, it was just...

18     Q.    And you mentioned a minute ago they said something

19  along the lines of, "Be careful.  We'll get you, and we will

20  get your family," or something along those lines?

21     A.    Some sort of, yeah.  There were a lot of things

22  said, but I'm just telling you what -- at this point, it's

23  been a while that I've received anymore phone calls.

24         THE COURT:  Was it a male voice?

25         THE WITNESS:  It was mainly male, and once, twice,

26  it was female, too.

27         THE COURT:  Okay.

28

46

BY MR. WASLEY:

 1

 2     Q.   And Mr. Bhatnagar, you have your attorney in court
 3  here today; is that right?

 4     A.   Yes, sir.

 5     Q.   And you are, in fact, suing Deputy Ingrassia; is
 6  that right?

 7     A.   Yes.

 8         MR. WASLEY:  No further questions at this time, your
 9  Honor.

10         THE COURT:  Anything else?

11         MR. AHEARN:  No, your Honor.

12         THE COURT:  Okay.  Mr. Bhatnagar, you're free to
13  leave.  And thank you very much for coming.

14         THE WITNESS:  Thank you.

15         THE COURT:  Next witness.

16         MR. AHEARN:  Yes, I have Raymond Eli.

17         THE CLERK:  Please raise your right hand.

18                          **RAYMOND ELI**

19         *called as a witness, having been duly*

20         *sworn, testified as follows:*

21         THE CLERK:  Thank you.  Please be seated.

22         Please state your name for the record, spelling both
23  your first and last name.

24         THE WITNESS:  Raymond Eli.  And it's R-A-Y-M-O-N-D.
25  Last name is E-L-I.

26         THE COURT:  Mr. Eli, I'm going to ask you to speak
27  up when you answer the questions.

28         THE WITNESS:  Sure.

47

1          THE COURT:  Okay.  Go ahead.

2                    DIRECT EXAMINATION

3    BY MR. AHEARN:

4          Q.   Good afternoon, Mr. Eli. Why are you here in court

5    today?  Did you receive a subpoena from my office?

6          A.   I did, yes.

7          Q.   We only spoke on the phone briefly yesterday to let

8    you know what time court was; is that fair to say?

9          A.   Correct.

10         Q.   And other than just briefly today, we haven't talked

11    before; is that correct?

12         A.   Yeah, that's correct.

13         Q.   Now, do you recall being pulled over on September

14    15th of last year?

15         A.   Correct.

16         Q.   And about 1:00 o'clock in the morning?

17         A.   Correct.

18         Q.   Do you recall who pulled you over?

19         A.   I do.

20         Q.   And who was that?

21         A.   Jason Ingrassia.  I guess that's how it's

22    pronounced, his last name.

23         Q.   Where did he pull you over?

24         A.   Bollinger Canyon and Crow Canyon Road at the

25    intersection.

26         Q.   Prior to him pulling you over, how long was he

27    behind you?

28         A.   Approximately about five blocks.

Case 3:07-cv-02669-CRB   Document 53   Filed 03/15/2008   Page 48 of 69

48

1    Q.   Okay.  Are you aware how many blocks that is away
2   from San Ramon Valley Road?
3    A.   From San Ramon, it is about ten blocks.
4    Q.   Okay.  While the officer was behind you, did you do
5   anything?
6    A.   I lit a cigar.
7    Q.   What happened when the officer pulled you over?
8    A.   He approached the car and said that I was speeding
9   at first.
10    Q.   Okay.  And what did you tell him when you --
11    A.   I told him I was not speeding.
12    Q.   And how did you know you were not speeding?
13    A.   Because when I noticed someone behind me within the
14   five-block radius of the stop, I looked at my speed.  And for
15   that particular speed on that street, it was 40, and I was
16   below 40.
17    Q.   Did he ever tell you any other reason why he pulled
18   you over?
19    A.   He says, "Well, if it wasn't for speeding, then you
20   didn't stop at the red light back there at San Ramon."  And I
21   had said, "Again, that's false."
22    Q.   And how did you know that was false?
23    A.   Because it's a large intersection with San Ramon and
24   Crow Canyon crossing each other.  When I approached, I was
25   leaving the hotel that's adjacent to San Ramon, coming out.  I
26   travel that way because I work next door to there.  So it was
27   common that I would stop if it was a red light, which I did.
28    Q.   And so you recall stopping at that red light?

*MONICA D. POPPER - CERTIFIED SHORTHAND REPORTER #12816*

1     A.    I did.

2     Q.    Did you see any officers around the area?

3     A.    I did not.

4     Q.    Did the officer ever ask you, or did Deputy

5  Ingrassia ask you what you had lit when he pulled you over?

6     A.    He did.

7     Q.    What did he say?

8     A.    I informed him that it was a Black and Mild cigar,

9  and what he said was it smelled good.

10    Q.    So you were eventually arrested that night; is that

11  correct?

12    A.    That is correct.

13    Q.    And it was for not having a valid driver's license?

14    A.    That is correct.

15    Q.    And I understand your testimony, though, is that you

16  were not speeding; is that correct?

17    A.    That is correct.

18    Q.    And you stopped at the intersection of San Ramon

19  Valley Boulevard and Crow Canyon?

20    A.    That is correct.

21    Q.    And you, in your case that you had, the driving on a

22  suspended license, you filed the suppression motion in that

23  case or your attorney did?

24    A.    That is correct.

25    Q.    Did Deputy Ingrassia testify at that hearing?

26    A.    He did.

27    Q.    So you would be able to recognize him if you saw

28  him?

1    A.    That is correct.

2    Q.    It was the same officer who pulled you over that

3    day?

4    A.    That is correct.

5          MR. AHEARN:    I have nothing further.

6          THE COURT:    Did you testify at that hearing?

7          THE WITNESS:    I did.

8          THE COURT:    Cross-examination.

9                         CROSS-EXAMINATION

10    BY MR. WASLEY:

11    Q.    Good afternoon, Mr. Eli (pronouncing), is it?

12    A.    Yes.

13    Q.    What was the date that you were pulled over by

14    Deputy Ingrassia?

15    A.    It was September 15th.

16    Q.    2006?

17    A.    2006 at 1:30.

18    Q.    What time of evening was that?

19    A.    No, sir, it was in the morning, early morning,

20    approximately around 1:30, 2:00 o'clock in the morning.

21    Q.    1:30 in the morning?

22    A.    Yes.

23    Q.    And what had you been doing prior to be pulled over?

24    A.    I was visiting a relative that was here on business

25    at the Sierra Hotel, which is in San Ramon.

26    Q.    And you testified a minute ago that prior to being

27    pulled over, you stopped at the stop light on -- I forget the

28    name of the intersections.

51

1    A.    I did.

2    Q.    Okay.  At what point did you notice a car following

3    behind you?

4    A.    Approximately five blocks after I made my right

5    turn, that's when I noticed a car behind me.

6    Q.    And what was the speed limit on the road you were

7    traveling?

8    A.    It was 40.

9    Q.    And you looked down -- after you saw a car behind

10   you, you were looking down and saw that you were going 40

11   miles an hour?

12   A.    Yes, because I didn't know if it was a cop or if it

13   was someone else that's behind me.  So I wanted to be safe,

14   because it was already 1:30, 2:00 o'clock in the morning.  I

15   looked down to see what the speed limit was.  I didn't know

16   that the speed limit was 40, but I knew that on my speedometer

17   it was 40.  And then a few days after the incident, I happened

18   to be in that area, and I noticed it was 40, so I knew I was

19   within the speed limit.

20   Q.    But at the time, you didn't know it was in the speed

21   limit?

22   A.    No, but I was within the speed limit.

23         MR. WASLEY:  One second, your Honor.

24         (Brief pause)

25         MR. WASLEY:  No further questions, your Honor.

26         MR. AHEARN:  Excused.

27         THE COURT:  Okay.  Did you say to the officer, "No,

28   I wasn't speeding"?

1           THE WITNESS:  Yes.

2           THE COURT:  Okay.  And why did you say that?

3           THE WITNESS:  Because when -- he followed me for an

4    additional five blocks.  You know, so with that being said, if

5    I was speeding, he should have pulled me over sooner.  You

6    know what I'm saying?  That's how I would feel.

7           THE COURT:  But is that why you said it?  See, you

8    just said, "I knew a few days later that it was 40, but I

9    didn't at the time."

10          THE WITNESS:  Right.

11          THE COURT:  So I'm trying to figure out then why did

12   you say, "No, I wasn't."

13          THE WITNESS:  Well, because like I travel that

14   street all the time.  I work in a -- I did work in the area.

15   So speeding to me would have been like 50, 60 in that area,

16   and I was assuming that it would be -- I was within that frame

17   of speed.  You know what I'm saying?  I didn't consider me

18   speeding.

19          THE COURT:  You just believed you weren't?

20          THE WITNESS:  Yeah, because --

21          THE COURT:  I got it.  Okay.

22          THE WITNESS:  -- you know, coming down that

23   particular highway, if I was doing 50, then I may have been

24   speeding.  You know, I wouldn't testify to that.  But I know

25   that I was within 40, 30 to 40 of the speed limit, so it had

26   to be within that realm of that particular area.

27          THE COURT:  Okay.  And then --

28          THE WITNESS:  Because, you know, like in residents

1   of schools, it can be like --

2           THE COURT:  Yeah, I have another question.

3           THE WITNESS:  -- 20 to 25 miles per hour.

4           THE COURT:  There's one other thing you said.  Now,

5   you said that you told him you weren't speeding, and then your

6   testimony was that he said -- you told him that you did not

7   fail to stop at the stop sign.  Then you testified that you

8   said, that he said, "Then you were speeding."  Did he really

9   say, "Then you were speeding"?

10          THE WITNESS:  No.  What he actually said, he -- in

11  the testimony what I said is that he initially said I was

12  speeding, and I told him "no".  Then he said, "Well, you ran

13  the red light," and I told him "no".  Then he went back and

14  said, "Well, it's either one."  That's what he said.

15          THE COURT:  Okay.

16          THE WITNESS:  So he wasn't clarifying what he really

17  was stopping me for.  He didn't -- I didn't even know why I

18  was being arrested until later on after I got to the station.

19  I didn't even know what the charges was besides, you know,

20  when he came back and told me that I had a suspended license,

21  you know, I didn't know I was going to go to jail on that, you

22  know.  So...

23          THE COURT:  Okay.  Anything else?

24          MR. AHEARN:  No.

25          THE COURT:  Okay.  Thank you, sir.  You're free to

26  go.

27          THE WITNESS:  Thank you.

28          THE COURT:  Anymore witnesses, Mr. Ahearn?

54

```
 1              MR. AHEARN:  Yes.  One second.
 2              Your Honor, at this point, I would call Mr. Smith to
 3   the stand.
 4              THE COURT:  You don't have to have your hands behind
 5   your back.  Raise your right hand.
 6                          RICHARD SMITH
 7              called as a witness, having been duly
 8              sworn, testified as follows:
 9              THE CLERK:  Thank you.  Please be seated.
10              Please state your name for the record, spelling both
11   your first and last name.
12              THE WITNESS:  My name is Richard, R-I-C-H-A-R-D.  My
13   last name is Smith, S-M-I-T-H.
14              THE CLERK:  Thank you.
15                      DIRECT EXAMINATION
16   BY MR. AHEARN:
17       Q.  Now, Mr. Smith, do you recall being stopped by
18   Deputy Ingrassia?
19       A.  Yes, I do.
20       Q.  In June of last year?
21       A.  Yes.
22       Q.  Do you recall checking your car prior to him pulling
23   you over?
24       A.  Yes.
25       Q.  What do you recall seeing in the car?  Was
26   everything working?
27       A.  Yes.  I checked all the lights and made sure
28   everything was working.
```

1        Q.    Why did you do that?

2        A.    Because I'm on parole, and I was driving on the

3    freeway, and if I got on the freeway and then the lights

4    wasn't working, then I would get pulled over and get stopped.

5        Q.    Had you been --

6              (Phone interruption)

7              THE COURT:    Excuse me.    This might be an emergency.

8    I have to get it.

9              (Brief pause)

10             THE COURT:    Okay.    Go ahead.

11             MR. AHEARN:    Madam Reporter, could you repeat my

12   last question.

13             (The reporter read back.)

14   BY MR. AHEARN:

15       Q.    Had you ingested any controlled substances that

16   night?

17       A.    Yes, I had.

18       Q.    What had you --

19       A.    Methamphetamine.

20       Q.    Was that another reason why you were scared to get

21   pulled over?

22       A.    Yes, because I get paranoid.

23       Q.    Okay.    Does that heighten your alertness when you

24   use that drug?

25       A.    Yes, it does.

26       Q.    Do you recall when you looked at your license plate

27   lamp to make sure it was working on the car?

28       A.    Yeah.    I recalled looking at it right before I left

56

1   my grandma's house at 1:00 o'clock in the morning.

2       Q.    Okay.   Do you recall after you were arrested,

3   looking -- well, you got arrested by Deputy Ingrassia; is that

4   correct?

5       A.    Yes.

6       Q.    And did he put you in the back of his patrol car?

7       A.    Yes, he did.

8       Q.    Were you able to see your license plate lamp at that

9   point?

10      A.    Yes.   I was able to see the whole rear of the car,

11  and everything looked in working condition.

12      Q.    Now, to be honest, Mr. Smith, you've been in a

13  little trouble in the past; is that fair to say?

14      A.    Yes.

15      Q.    You've been convicted of driving or taking -- being

16  in possession of a stolen vehicle four times, is that about

17  right, since 2000?

18      A.    Yes.

19      Q.    You've also been found guilty of being in receipt of

20  stolen property before?

21      A.    Yes.

22      Q.    You've also been in prison before; is that true

23  since you were on parole?

24      A.    Yes.

25      Q.    But you're telling us the truth that your light was

26  working prior to you getting pulled over by Deputy Ingrassia;

27  is that correct?

28      A.    Yes, I am.

57

1              MR. AHEARN:   I have nothing further.

2              THE COURT:   Cross-examination.

3              MR. WASLEY:   Yes.

4                        CROSS-EXAMINATION

5    BY MR. WASLEY:

6         Q.   Good afternoon, Mr. Smith.

7         A.   Good afternoon.

8         Q.   I want to talk specifically about the evening of

9    June 21st, 2006.  You were pulled over at 4:48 a.m.; is that

10   right?

11        A.   Yes.

12        Q.   And you mentioned a minute ago on direct that you

13   had recently checked all the lights in the back of the vehicle

14   you were driving; is that right?

15        A.   Yes.

16        Q.   What time did you check those lights?

17        A.   I checked those lights at 1:00 o'clock in the

18   morning when I left my grandma's house.

19        Q.   Where does your grandmother live?

20        A.   My grandma lives in San Pablo.

21        Q.   And where were you pulled over?

22        A.   In San Ramon.

23        Q.   What were you doing in between 1:00 a.m. and 4:48

24   a.m. that evening?

25        A.   Driving.

26        Q.   Where were you driving?

27        A.   I drove on the highway, Highway 80, and I took the

28   13, 13 over to 580, and then 580 all the way around to 680,

58

1    and I was coming back that way.

2         Q.   Were you driving anywhere in particular or...

3         A.   I was driving to go see a friend.

4         Q.   Where does that friend live?

5         A.   I thought it was Hayward, but then I was talking

6    about it, and it was off of 13, so I'm thinking it might have

7    been San Leandro.

8         Q.   So did you drive out to Hayward that night?

9         A.   No.  I got off the exit down Highway 13.

10        Q.   Okay.  And then after you realized that your friend

11   wasn't in Hayward, he lived in San Leandro?

12        A.   No.  No.  I thought it was Hayward that I was

13   driving to, and it really wasn't.  It was San Leandro I

14   believe it was.

15        Q.   So after you learned that, do you recall

16   approximately what time it was that you learned that your

17   friend didn't live in Hayward?

18             MR. AHEARN:  Your Honor, I think that misstates the

19   testimony.

20             THE COURT:  Just answer the question.

21             THE WITNESS:  I would say it had to be like

22   2:00 o'clock.

23   BY MR. WASLEY:

24        Q.   So about an hour after you left your grandmother's

25   house?

26        A.   Yeah.

27        Q.   So at 2:00 a.m., you realized that your friend

28   didn't live in Hayward.  So then where did you head after

59

1    that?

2         A.    Then I decided to take the long way back to Richmond

3    because me and my girlfriend that was at my grandma's house

4    that I left there, were in an argument, and I didn't want to

5    go straight back.

6              THE COURT:   Was she in the car?

7              THE WITNESS:   No.   She wasn't in the car.

8    BY MR. WASLEY:

9         Q.    So you drove around from -- it took you from 2:00

10   a.m. to 4:48 a.m. to get to San Ramon Valley Boulevard; is

11   that right?

12        A.    Yeah.

13        Q.    Was there a traffic accident that night?

14        A.    No.

15        Q.    Did you stop to get anything to eat that evening?

16        A.    Just -- I didn't -- just when I stopped at 7-Eleven.

17   That was the only time I stopped to get something to eat.

18        Q.    Did you drive through any residential neighborhoods

19   that evening?

20        A.    Yeah, I drove through the Oakland Hills.

21        Q.    What were you doing in the Oakland Hills?

22        A.    I was out there, and I was driving my friend out

23   there and dropping him off, and he was checking cars to see if

24   there was like any money or anything we could steal out of the

25   cars to get more drugs.

26        Q.    Okay.   And you mentioned you use methamphetamine; is

27   that right?

28        A.    Yes, I do.

60

1      Q.    How often do you use methamphetamine, Mr. Smith?

2      A.    On a daily basis when I'm using.

3      Q.    Do you shoot methamphetamine?

4      A.    I do.

5      Q.    Okay.   And on the night you were pulled over by

6   Deputy Ingrassia, you had used methamphetamine; is that right?

7      A.    Yes.

8      Q.    At what point in the evening did you use

9   methamphetamine?

10     A.    I used it earlier.   It was the night before because

11  I got pulled over in the morning, so it was like

12  10:00 o'clock that night before.

13     Q.    At your grandmother's house?

14     A.    Not at my grandmother's house, at my friend's house

15  up the street.

16     Q.    How much methamphetamine did you use that night?

17     A.    I don't know.   Maybe I smoked like a quarter gram to

18  a half gram.

19     Q.    And after you smoked this methamphetamine, is that

20  when you checked the back lights of your vehicle?

21     A.    No.   I checked the back lights of my vehicle at 1:00

22  o'clock after me and my girlfriend got into an argument.   I

23  went back up to my friend's house, and I was like, you know

24  what I mean.   I didn't want to stay there.   I didn't want to

25  go home.   So I'm like, "You want to go take a -- you want to

26  go ride around?   I have a full tank of gas."   And he said,

27  "Yeah."   It was 1:00 o'clock in the morning.   I'm on parole.

28  I'm paranoid.   I don't want to get pulled over.

1      Q.   Right.   But you had checked the lights after you had

2    smoked methamphetamine that night; is that right?

3      A.   Yes.

4      Q.   And you mentioned when you use methamphetamine, it

5    makes you paranoid?

6      A.   Yeah.

7      Q.   I want to talk about that vehicle that you were

8    driving that day.   Whose car was that that you were driving?

9            MR. AHEARN:   Objection, relevance.

10           THE COURT:   Overruled.

11           THE WITNESS:   It was a stolen vehicle.

12   BY MR. WASLEY:

13     Q.   Okay.   Just a few more questions, Mr. Smith.   When

14   did you come into possession of this stolen vehicle?

15           MR. AHEARN:   Objection, relevance.

16           THE COURT:   Overruled.

17           THE WITNESS:   I don't know.   Like a week prior to

18   this.

19   BY MR. WASLEY:

20     Q.   And did you check the lights, the rear taillights of

21   it?

22     A.   Yes, I did, because when I changed the license plate

23   and I put my license plate on the back of it, I did it at

24   nighttime.   And in order for me to see the screws, the light

25   would have to be illuminated.

26     Q.   Okay.   What do you -- do you recall the model and

27   the make of the vehicle?

28     A.   Yes.   It was a '86 Honda Prelude.

1      Q.   Okay.  And when you were contacted by Deputy

2    Ingrassia that evening, was there another officer with him?

3      A.   No, there wasn't.

4      Q.   At some point, did another officer arrive?

5      A.   Yes, after I was already detained in the back of the

6    car

7               MR. WASLEY:  No further questions, your Honor.

8               THE COURT:  Anything else?

9               MR. AHEARN:  Nothing.

10              THE COURT:  Okay.  You may step down.

11              Any further witnesses or evidence for the defense?

12              MR. AHEARN:  No.

13              THE COURT:  For the People?

14              MR. WASLEY:  Yes, your Honor.  We would actually

15   like to call Officer Shields.

16              THE COURT:  Is he here?

17              (Off-the-record discussion between Mr. Wasley and

18              Mr. McConkie.)

19              MR. WASLEY:  Okay.  Well, then cancel that.  We're

20   not going to call Officer Shields.

21              So the People have no further evidence, your Honor.

22              THE COURT:  Okay.  So you rest?

23              MR. WASLEY:  We rest.

24              THE COURT:  All right.  So this is a matter of

25   credibility.  If the light was inoperable or not operating at

26   the time of the stop, then the motion would be denied.  And if

27   it was working, then the motion would be granted.

28              What is the People's argument?

63

1           MR. WASLEY:  Well, with respect to the credibility,

2   we've heard from three witnesses today.  The first one

3   admitted to having consumed alcoholic beverages on the day

4   that he was pulled over and cited.  He never -- apparently had

5   never drank in that entire year except for that night and was

6   under the influence of alcohol.

7           The second witness --

8           THE COURT:  Wait.  And therefore?

9           MR. WASLEY:  And, therefore, we have an officer on

10   duty, a sworn peace officer, who was -- who testified in court

11   under oath the reasons why he pulled the person over.  And I

12   think in terms of credibility when you're weighing a witness

13   who -- and also -- sorry, I forgot to add this in -- who is

14   suing Deputy Ingrassia, so he has a marked interest in the

15   outcome of this case and what he says on the record.  In fact,

16   he did not want to testify because it might mess up the case

17   that he has against Deputy Ingrassia.

18           THE COURT:  Well, actually, that's not what I recall

19   him saying.  But go ahead then with the second witness.

20           MR. WASLEY:  The second witness, as I pointed out

21   and your Honor pointed out, he was convinced he wasn't

22   speeding, although he didn't even know the speed limit until

23   two days later on the road that he was driving as opposed to,

24   you know, Deputy Ingrassia who said he was speeding.

25           And then these are tangential to this issue here,

26   which is, was the light out, and did he have reasonable

27   suspicion to pull over the defendant in this case.  And the

28   defendant, who has admitted to being in possession of a stolen

1    car, to using methamphetamine whenever he can, shooting it on

2    occasion, smoked it that evening at 10:00 o'clock that

3    evening.   Then apparently at 1:00 a.m., went out after using

4    methamphetamine, which he admitted makes him paranoid, then

5    checked allegedly all the lights in the back of the car.   And

6    then at 1:00 a.m. and between 4:48 a.m., went on a burglary

7    spree or attempted burglary spree in Contra Costa County.

8                   So what we have is --

9               THE COURT:   You don't consider those statements

10   against penal interest of any value?

11              MR. WASLEY:   I think they are high value, your

12   Honor.   I think they go directly to the credibility of the

13   witness on the stand.

14              THE COURT:   Statements against penal interest imply

15   their truth.

16              MR. WASLEY:   He -- you're correct.   But I think they

17   definitely are relevant and highly relevant to his credibility

18   as a witness.

19              THE COURT:   Yes.   That's exactly what I'm saying.

20              MR. WASLEY:   So he admits to using methamphetamine

21   on the evening of -- is shaky on the details of what exactly

22   he was doing between 1:00 a.m. and 4:48 a.m. and --

23              THE COURT:   Looking for cars to break into.

24              MR. WASLEY:   Right.   So I think in the balance of

25   who's more credible -- admitted meth, convicted felon, meth

26   addict and Deputy Ingrassia -- I think Deputy Ingrassia is

27   easily a more credible witness, your Honor.

28              THE COURT:   Okay.   Mr. Ahearn?

1          MR. AHEARN:  Your Honor, I think if it was just a

2    battle between Mr. Smith and Deputy Ingrassia based on

3    Mr. Smith's past, I think the Court might have a hard time

4    granting this motion.

5          Mr. Smith was probably not very likeable that night

6    going around through Oakland Hills and Contra Costa County

7    looking for things to steal.  He's been in trouble before.

8    But he got up there and he told you that's what happened, and

9    I think as you said, I think does weigh towards his

10   credibility that he actually did check the light.  He actually

11   told you, "I switched the license plate on the car.  I did it

12   at night.  At that point, I needed the license plate lamp on.

13   That's the only way I could have screwed it into the back."

14         And we also have Mr. Bhatnagar and Mr. Eli who are

15   not like Mr. Smith.  Mr. Bhatnagar came in in a suit.  He came

16   well dressed.  He was well spoken.  He well remembered what

17   happened.  And I found him -- I hope you find his testimony

18   very credible about what happened.  And the same with Mr. Eli.

19   He came, presented himself very well.  Didn't -- apparently

20   was pulled over for a suspended license.  He answered your

21   questions forthright, and he was fairly certain, and he knew

22   that he had not done anything with this officer.

23         This officer has a history of fabricating probable

24   cause, and that's what was done here.  And it's unfortunate to

25   say, and no one ever likes to hear it.  No one ever likes to

26   find it, but that's what happened in this case.  I think the

27   Court, based on the testimony -- I don't know if the Court

28   viewed or saw Deputy Ingrassia's testimony, but he never

1   looked at me in the eye.  He was looking down the entire time,

2   and I think that speaks volumes about what's going on here.

3            He was served with a lawsuit today, and he's not

4   going to get up and admit certain things happened because he

5   could lose his job, could be sued.  So I think there's

6   another -- there's an alternative reason for him as well not

7   to testify truthfully.  So I think the Court, based on the

8   evidence that it has before it, has no choice but to grant

9   Mr. Smith's motion.

10           THE COURT:  I noticed that demeanor, too, and it

11  could have been, oh, my God, this thing is never going to

12  leave me.  Or, yes, it was a lie.  It could be a lot of

13  things, but it definitely reflected a nervousness, and I know

14  what you're saying.  I saw it.

15           I do believe the first witness the most, because he

16  remembered the most.  And while Mr. Eli could have been

17  mistaken, I don't think Mr. Bhatnagar could have been mistaken

18  at all about what happened.

19           So what is the burden of proof at a motion to

20  suppress?  Isn't it just -- isn't it just, do I entertain a

21  strong suspicion?  Isn't it probable cause?  Well, actually,

22  the reasonable -- did he have reasonable suspicion to detain?

23  Well bottom line is, I can't even get there unless I believe

24  that what he claims is his reasonable suspicion actually

25  occurred.

26           And the burden of proof, you know, is sort of going

27  out the window.  The question is really, who do you believe,

28  and do I believe Officer Ingrassia.  And I have to say in

67

1    light of the other testimony, it really casts a shadow.  I'm

2    not saying that this man's light wasn't out.  It may very well

3    have been.  But credibility is so much an issue here.  A big

4    shadow is cast over his believability in this particular case

5    that I would have to grant the motion to suppress.

6              So do the People have any further evidence with

7    which to proceed against the defendant?

8              MR. WASLEY:  Submitted, your Honor.

9              THE COURT:  Meaning you cannot independently prove

10   the case?

11             MR. WASLEY:  Yes, your Honor.

12             THE COURT:  Okay.  Then is the defendant being held

13   in custody on anything else?

14             MR. AHEARN:  I believe there's an out of county --

15             THE COURT:  Parole hold?

16             MR. AHEARN:  -- parole hold, out of county warrant.

17   But I would request that the case be dismissed.

18             THE COURT:  With regard to this case, this case is

19   dismissed for insufficient evidence, and he is released, this

20   action only.  Therefore, if he has any other holds, he has to

21   take care of those.  And thank you very much.

22             MR. WASLEY:  Thank you, your Honor.

23             THE CLERK:  Counsel, I received a call on this

24   matter that there's a readiness conference in Department 35.

25             THE COURT:  Well, that's vacated, and all other

26   dates are vacated.

27

28

68

1              THE CLERK:  Okay.  Thank you.

2          (Proceedings adjourned.)

3

4                    ---oOo---

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

69

1    STATE OF CALIFORNIA )

2                       )  ss.

3    CONTRA COSTA COUNTY )

4

5

6           I, MONICA D. POPPER, Certified Shorthand Reporter,

7    do hereby certify that as such I took down in stenotype all of

8    the proceedings in the within-entitled matter, THE PEOPLE OF

9    THE STATE OF CALIFORNIA, Plaintiff, versus RICHARD EUGENE

10   SMITH, Defendant, Superior Court Action Number 5-070257-1,

11   heard before the Honorable NANCY DAVIS STARK, JUDGE, on AUGUST

12   8, 2007, and that I thereafter transcribed my stenotype notes

13   into typewriting through computer-assisted transcription, and

14   that the foregoing transcript constitutes a full, true, and

15   correct transcription of the proceedings held at the

16   aforementioned time.

17          IN WITNESS WHEREOF, I have hereunto subscribed my

18   name this date, September 17, 2007.

19

20

21

22                         _Monica D. Popper_

23                         MONICA D. POPPER

24                         Certified Shorthand Reporter #12816

25

26

27

28

*MONICA D. POPPER - CERTIFIED SHORTHAND REPORTER #12816*