# EXHIBIT E

JUSTICE FIRST, LLP
Jenny C. Huang, SBN 223596
2831 Telegraph Avenue
Oakland, CA  94609
Telephone: (510) 628-0695
Fax: (510) 272-0711
E-mail: jhuang@justicefirstllp.com

JUSTICE FIRST, LLP
Sarita I. Ordóñez, SBN 216047
P.O. Box 181
Imperial Beach, CA  91933-0181
Telephone: (510) 628-0695
Fax: (510) 272-0711
E-mail: sordonez@justicefirstllp.com

JIVAKA CANDAPPA, SBN 225919
5111 Telegraph Avenue, #215
Oakland, CA  94609
Telephone: (510) 654-4129
Fax: (510) 594-9610
E-mail: jcandappa@sbcglobal.net

Attorneys for Plaintiff Abhinav Bhatnagar

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ABHINAV BHATNAGAR,<br><br>Plaintiff,<br><br>vs.<br><br>JASON INGRASSIA, individually and in his official capacity; COUNTY OF CONTRA COSTA; and CITY OF SAN RAMON.<br><br>Defendants. | Case No.:  Case No. CV07-02669 CRB<br><br>**AFFIDAVIT OF ABHINAV BHATNAGAR IN SUPPORT OF PLAINTIFF'S MOTION FOR PROTECTIVE ORDER** |

I, ABHINAV BHATNAGAR, state under penalty of perjury as follows:

1.      I am the Plaintiff in the above-referenced action.  I submit this affidavit in

support of my motion for a protective order to prohibit Defendant Jason Ingrassia from

attending the deposition of Richard Ha.

- 1 -

My Arrest on May 20, 2006

2.    On May 20, 2006, I was getting gas at the Valero gas station in San Ramon when I was approached by a very drunk Caucasian woman.  As I was walking towards the cashier, she asked me for money and I politely declined.

3.    It was at this time that Defendant Ingrassia approached me and the Caucasian woman, but started questioning me for no reason.

4.    When Defendant Ingrassia asked whether I had been drinking, I told him that I had a few drinks earlier.  He then arrested me, took me to the San Ramon police station, and then brought me to the Martinez jail where I was held in custody overnight.

5.    Defendant Ingrassia was very threatening and hostile towards me on the day of my arrest.  He repeatedly called me a terrorist and made several hateful comments about Asians. At that time, I was very intimidated by Defendant Ingrassia and feared for my own safety because of his hateful comments and hostile, aggressive behavior.

6.    To cover-up his discriminatory conduct, Defendant Ingrassia made false statements in his police report and under sworn testimony about the circumstances under which I was arrested.

7.    Contrary to Defendant Ingrassia's statements in his police report and his subsequent testimony, I did not make an illegal u-turn before arriving to the gas station and the officer did not stop me while I was driving my car.  Also, the emergency lights to the Defendant Ingrassia's patrol car were not turned on that night, as he claimed.

Harassing Conduct by Defendant Ingrassia

8.    Throughout my criminal case and my proceedings before the Department of Motor Vehicles ("DMV"), I was intimidated and felt harassed by Defendant

Ingrassia's threatening behavior.

9.    For instance, as I waited for my DMV hearing to begin on July 26, 2006, Defendant Ingrassia approached me and said, "Hey, good evening, how are you doing?"  I did not respond.  I thought that the officer's comment was very odd since it was early in the morning.

10.    Defendant Ingrassia then sat near me and stared at me, making me feel very anxious and uncomfortable.  While seated, the officer made a bizarre gesture at me, which I perceived in a threatening manner.  Considering Defendant Ingrassia's hostile behavior towards me on May 20, 2006, I was very intimidated by Defendant Ingrassia's strange greeting and subsequent stares.

11.    The suppression motion hearing for my criminal case was originally scheduled on October 16, 2006.  As I sat outside the courtroom waiting for the suppression motion hearing to begin, I saw Defendant Ingrassia waiting with 3-4 other police officers.  Defendant Ingrassia and these other police officers stared and looked at me for 15-20 minutes as I waited outside of the courtroom.  Due to my past encounters with Defendant Ingrassia, I was intimidated by Defendant Ingrassia and the other officers staring at me.

12.    On March 30, 2007, a rehearing was scheduled at the DMV to review the suspension of my driver's license.  While waiting for the hearing to begin, I saw Defendant Ingrassia briefly, at which time he again looked at me in a threatening manner.

Harassing and Threatening Phone Calls

13.    On July 26, 2006, Defendant Ingrassia testified at my DMV hearing.  His testimony was contradicted by various witness statements that were first provided to Defendant Ingrassia at the end of the hearing that day.  Defendant Ingrassia looked very angry as he reviewed the witness statements that day.

14.     On July 27, 2006, the very next day after my first DMV hearing, I received a threatening phone call from someone who cursed and threatened me with physical violence. This was the first of many harassing and threatening phone calls to come.

15.     Over the following several months, I received many threatening phone calls, mostly late at night.  The caller told me, among other things, "watch your back," "watch your family," "be careful," "watch out," and "you don't belong here."  Between July and October of 2006, I received at least 15 phone calls of this nature.

16.     I also received many phone calls where the caller remained silent but stayed on the line.  These calls tended to occur late at night and virtually always originated from blocked phone numbers.

17.     I noticed that these disturbing phone calls were more frequent around dates related to my DMV, criminal, and traffic ticket cases.  For example, within a week after my March 5, 2007 traffic ticket hearing, I received more than ten threatening phone calls in one day.  The caller was extremely abusive, stating things such as, "why can't you talk, you mother fucker," "I'm trying to talk to you – listen to me," "I'm going to fuck your mom," and "I'm going to destroy your family."

18.     My family was so disturbed and frightened by these threatening phone calls that I contacted the phone company and arranged to have unidentified phone calls blocked from our home phone.  I also avoided answering any phone calls from unidentified phone numbers.

19.     Because of Defendant Ingrassia's past conduct towards me as well as the timing of the phone calls, I believe that Defendant Ingrassia is responsible for the many threatening and harassing phone calls I have received.

Retaliatory Traffic Citation Issued by Defendant Ingrassia on September 29, 2006

20.     In the early morning hours of September 29, 2006, I went to the Valero Gas

Station in San Ramon in order to see Richard Ha, who had witnessed the arrest on May 20, 2006.

21.     Not long after I left the gas station, I was pulled over by a police patrol car.  I was terrified when I realized that it was Defendant Ingrassia pulling me over.

22.     Defendant Ingrassia approached me in my car and said many threatening things to me, such as, "Do you remember me?" "What the fuck are you doing in San Ramon?  I'll break your bones if I see you in San Ramon again." "Your attorney can't do anything to me." "I can take your ass to jail anytime.  I can take you to jail even right now."

23.     At that time, I was afraid for my life and I thought Defendant Ingrassia was going to physically hurt me.

24.     Based on the things he said to me, I believe Defendant Ingrassia knew at that time that he was under investigation by internal affairs as a result of actions taken by my public defender, Diana Garrido.

25.     Defendant Ingrassia then issued me a ticket for making an illegal u-turn. However, I never made any u-turns that night after I left the Valero Gas Station on September 29, 2006.

26.     In regards to my arrest on May 20, 2006, Defendant Ingrassia also claimed in his police report that he saw me make an illegal u-turn.  Similarly, I never made any u-turns on my way to the gas station on May 20, 2006.

27.     After this incident on September 29, 2006, I was afraid to return to San Ramon. I was also concerned for my safety and the safety of my family if I continued to challenge the criminal charges brought against me.

28.     On March 5, 2007, I testified in a traffic court proceeding for the traffic citation that Defendant Ingrassia issued me on September 29, 2006.  Defendant Ingrassia was present

during my testimony and it was uncomfortable for me to testify in his presence. Throughout my testimony, Defendant Ingrassia smiled and smirked at me, looked at me in an intimidating manner, and at one point, he started laughing at me.

Internal Affairs Investigation

29.    In August of 2006, my criminal lawyer, Diana Garrido, requested that the San Ramon Police Department and the Contra Costa County Sheriff's Department ("Sheriff's Department") conduct an investigation into suspected harassing and retaliatory conduct by Defendant Ingrassia against both me and a witness, Mr. Ha. In response to her request, the Sheriff's Department conducted an internal affairs investigation.

30.    On January 19, 2007, I was scheduled for an interview by internal affairs investigators with the Sheriff's Department. I arrived for the interview with my attorney, Jenny Huang. After we arrived, I was accosted by two investigators as I exited the restroom and was escorted by them to a room, without my counsel. I was confused and scared at that time and felt as if I was under arrest again.

31.    The internal affairs investigators attempted to start the interview without my attorney, insisting that she did not need to be present for the interview. It was only when I refused to proceed without my counsel that the investigators then permitted Ms. Huang to join the interview.

32.    I thought the investigation was supposed to be focused on allegations of misconduct against Defendant Ingrassia. Instead, I felt that I was the one being investigated. During my interview, I was interrogated for two hours mostly about facts that were already decided in my favor in the criminal case.

33.    It was during the traffic court hearing that I first learned from Defendant Ingrassia that the internal affairs investigation had completed and it concluded that my

allegations of misconduct were unfounded.

34.     By letter dated March 12, 2007, I was informed that the internal affairs investigation found sufficient evidence to show that the misconduct did not occur as I alleged. This letter is attached herein to my affidavit as Exhibit 1.

35.     I was disheartened by the findings of the internal affairs investigation because it has always been my primary interest that Defendant Ingrassia receive some form of discipline for all that he has done to me.  I am very concerned that in the absence of any discipline for his flagrant misconduct, other people will continue to suffer the indignities that I was subjected to by this officer.

36.     I was also discouraged by the findings of the internal affairs investigation because I felt that it gave Defendant Ingrassia permission to continue harassing me and my witness, Mr. Ha.  I have no faith that the Sheriff's Department will do anything to stop the ongoing harassment and retaliation against me or Mr. Ha.

My Deposition on October 17, 2007

37.     On October 17, 2007, I was deposed by counsel for the Defendants in this case. Defendants' counsel did not inform me that Defendant Ingrassia would be attending my deposition until after I arrived for my deposition.

38.     Although I was very nervous and afraid to go forward with my deposition in the presence of Defendant Ingrassia, I agreed to do so because I did not want to be uncooperative and did not want to let him scare me.

39.     During my deposition, I was very nervous, anxious, and emotionally stressed to be in the same room for an entire day with the same officer who has flagrantly harassed and retaliated against me for well over a year.

40.     Defendant Ingrassia left my deposition early, shortly after 5pm.  When he left the

room, I felt a huge sense of relief that he was gone.

41.    My deposition continued until after 7pm that night and I felt much more calm, articulate, and composed during my deposition without Defendant Ingrassia present in the room. Although I was able to testify truthfully throughout my deposition, I felt that I was able to testify much more freely and without fear or intimidation once Defendant Ingrassia left the room.

Upcoming Deposition of Richard Ha

42.    Based on conversations that my counsel and I have had with Richard Ha, I know that Mr. Ha is afraid to be involved in this lawsuit because he fears continued harassment and retaliation by Defendant Ingrassia.

43.    Although I was willing to be deposed in the presence of Defendant Ingrassia, I am concerned that Mr. Ha will not agree to such a deposition because he lives in San Ramon and fears for his safety.

44.    I believe that a protective order to exclude Defendant Ingrassia from the deposition of Mr. Ha is necessary to allow this witness to testify freely and without intimidation about the events that he saw on the night of my arrest.

45.    Based on my own encounters with Defendant Ingrassia, I believe that he is responsible for the repeated harassment and retaliation of Mr. Ha.  I believe this protective order is also necessary to prevent the officer from further interfering and intimidating this key witness in my case.

//

//

//

//

I declare under penalty of perjury that the foregoing is true and correct. Executed

on October 29, 2007 in Oakland, California.

ABHINAV BHATNAGAR

# EXHIBIT 1



County of Contra Costa

## Office of the Sheriff
Warren E. Rupf
Sheriff

*March 12, 2007*

*Mr. Abhinav Bhatnagar*
*36927 Papaya Court*
*Newark, CA 94560*

*Mr. Bhatnagar:*

*This letter is to inform you that the investigation of your Citizen Complaint report that you dated November 16, 2006 is completed. For the record, the investigation focused on your allegations of misconduct by Officer J. Ingrassia on two separate occasions.*

*Internal Affairs Sergeant, T. Anderson, conducted an exhaustive investigation. Commander S. Daly, Captain D. Pascoe and Interim Police Chief, J. Hatchell, reviewed his report. There was further review by Undersheriff G. Lawrence.*

*Your allegation(s) of misconduct, specifically treatment of the public and equality of enforcement, have both concluded with an **unfounded** finding. That means the investigation has disclosed sufficient evidence to prove the acts complained of <u>did not occur</u> as alleged.*

*Should you have any questions, or feel I can be of further assistance, please call the number listed below.*

*Sincerely,*

**WARREN E. RUPF**, *Sheriff*

*Eric Navarro, Lieutenant*
*Professional Standards Unit*
*(925) 335-1519*